223 So.2d 642 (1969)
Clara Gentry Ford WASHINGTON, Dependent of Lorensy Washington, Deceased
v.
GREENVILLE MANUFACTURING & MACHINE WORKS and United States Fidelity & Guaranty Company.
No. 45269.
Supreme Court of Mississippi.
May 26, 1969.
Rehearing Denied July 3, 1969.
Wroten, Orlansky & Miller, Greenville, for appellant.
Campbell, DeLong, Keady & Robertson, Greenville, for appellees.
*643 INZER, Justice:
This is a workmen's compensation case. Clara Gentry Ford Washington, appellant, is the wife of the deceased, Lorensy Washington, formerly employed by appellee, Greenville Manufacturing and Machine Works. A claim was made on behalf of appellant under the Mississippi Workmen's Compensation Act due to the death of her husband. After a hearing the attorney referee found as follows:
1. Lorensy Washington was found dead on the floor just inside the sliding door to the Metal Fabrication and Cutting Shop of the Greenville Manufacturing and Machine Works at approximately 6:40 a.m. on November 4, 1964, where he worked as a layout and design man;
2. The death of Lorensy Washington arose out of and in the course of his employment;
3. The deceased had no prior existing disease, handicap or lesion which contributed to his death within the meaning of Section 4 of the Mississippi Workmen's Compensation Act; and
4. The average weekly wage of Lorensy Washington at the time of his death was $106.45.
The Mississippi Workmen's Compensation Commission reversed the attorney referee on appeal and in a two to one decision found that "the death of Lorensy Washington did not arise out of and in the course of his employment but was due solely to an underlying pre-existing arteriosclerotic heart disease." The majority indicated that they based their opinion on the medical testimony offered by the appellees. The Circuit Court of Washington County affirmed the Commission and appeal was had to this Court.
The unconverted facts developed at the hearing are as follows. November 4, 1964, at about twenty minutes before seven a co-worker of Lorensy Washington discovered him lying on the floor just inside the building housing the department wherein the decedent worked at their place of employment. The location of decedent was some 18 to 20 inches past a large metal door through which he usually passed upon arriving at work every morning. It is not clear whether he was discovered being on his back or his stomach, however, the witness testified to noticing a small cut on the decedent's forehead above the left eye. There was also a small amount of blood on the floor. The decedent's hat was lying on the floor a few feet from his head. Another employee was called and attempted to take decedent's pulse. Finding no pulse an ambulance was called and deceased was taken to the hospital where he was pronounced dead on arrival.
It was not established by direct evidence at what time the decedent had arrived at his place of employment that morning or what transpired after he arrived, however, his usual routine was shown. The appellant testified that the decedent was expected to begin work at 7 A.M. but would usually leave to open up the shop at around 6:30 A.M. which was a part of his duties. He would drive the several blocks between his residence and place of employment and park on the street. He would then walk through the gate and across the grounds to the large metal sliding door in the rear of the building. The decedent had a key to this door and would open it by pulling to the left with the weight of his body. Usually the door was relatively easy to open. After opening the door he would proceed to prepare for the day's work. The circumstantial evidence, his position on the floor and the proximity of his hat, while not establishing in any way that he followed his usual routine without deviation or incident is not in conflict with that conjecture.
Dr. Leon Lenoir, Jr., internal medicine specialist, testified for appellee that since 1959 he had been treating the decedent for hypertensive cardiovascular disease. He said that he was notified on November 5, 1964, that decedent had been brought into *644 the hospital and he examined him within minutes. He determined that decedent was in fact dead. Dr. Lenoir signed the death certificate which listed the immediate cause of death as cardiac arrhythmia, type undetermined due to arteriosclerotic heart disease. There was no autopsy performed but it is clear how the doctor diagnosed the cause of death from his testimony. "The facts that I based it on would be my knowledge of this man and his health and also what I was told by the people who would have known his work habits." From this basis the doctor testified that in his opinion Lorensy Washington died of a heart attack which was due 100 percent to a pre-existing condition and had no relation to his employment. On cross examination the doctor was asked about the laceration on the decedent's forehead and he admitted he did not remember examining it. He indicated, however, that he was sure that if it had been sufficiently serious to have been the cause of death he would have noticed it.
It is clear from the testimony of the doctor, which the majority of the commission found so persuasive that his conclusions were based on two assumptions which, however logical or reasonable, do not rise to the level of substantial evidence upon which to overcome the presumption of work related death arising under the circumstances of his case. First the doctor assumed that the decedent had died of a heart attack. He based this assumption on his knowledge of the history of the heart disease and a lack of any other superficially apparent cause of death even though he admitted failing to examine the laceration on decedent's head. Secondly, he assumed that the decedent's employment had not contributed to his heart attack. He based this assumption on information of the decedent's "usual" morning routine although there was no direct evidence as to what had actually transpired on the morning in question. This second assumption is patently conjectural and was not proper opinion testimony. The doctor had nothing upon which to base his testimony that the decedent's job did not in any way contribute to his death even assuming that he died of a heart attack. On cross examination the doctor stated in part as follows:
Q. If he had been doing something which was strenuous when he arrived at his place of employment would that not have been a material factor in helping you to determine the cause of death?
A. Well, if he had been undertaking any severe or unusual effort I would think that it would be important.
Q. In what manner, Doctor?
A. We, medically speaking, feel it unwise for people who had this condition to undertake any unusual strenuous activities.
Q. For what reason?
A. It has a bad effect. It may overstrain their heart.
Q. And, in this case, we don't know whether or not he was engaged in any unusual or strenuous activity just before he died, do we, as a matter of fact?
A. We don't know what he was doing.
Q. Right, in connection with your examination of his body at the General Hospital, Doctor, did you observe blood on his head?
A. Well, in all honesty, I can't recall that I did of first-hand knowledge. I was told about this inquiring into the circumstances around his death in order to try to form an opinion about the cause of death so I could sign that death certificate; and I have, from what I was told, I have no reason to doubt that he suffered some abrasion or contusion on his forehead or head when he fell.
Q. You do not recall, then, Doctor, having examined the extent of any *645 injury which might have produced this blood on his head.
A. I think this, had it been any injury of any moment, I most certainly would have examined it.
Q. But, just speaking from the standpoint of recollection, you don't recall the extent of your examination in this regard?
A. If you mean can I describe exactly that laceration or contusion, I cannot.
Q. Could this have been, then, a laceration or an incised wound or puncture wound?
A. I think that anything that could have inflicted an injury to this man which would have in any way caused his death would have created enough evidence of trauma that it would have certainly been obvious.
He also indicated in determining what caused the decedent's death it would have been material assistance to him to know what he was doing immediately prior to his death. When he was asked the question, "When someone is not there to observe and record them, there is necessarily surmise and speculation and conjecture as to these symptoms or circumstances, is there not?" The doctor's answer was, "If a conclusion of why he died is not to be reached, yes." The doctor was further asked the following hypothetical question on direct examination:
That the uncontradicted proof in this case shows that on November 5, 1964, Lorensy Washington left his home at approximately 6:30 A.M. for work, driving his automobile, as was his custom. That he made no complaints whatsoever to his wife with regard to feeling ill or unwell and seemed to be as usual. That it was his invariable practice upon reaching the place of business where he worked to park his automobile, open a gate, go to the back door of the shop, unlock the shop door, slide the door back on rollers and enter the shop. That at approximately 6:40 A.M. on the day in question, that is only some 10 or 15 minutes after leaving his home; he was discovered by a fellow employee lying just inside the sliding rolling door to the shop, the door only partially opened. That there were no signs of life. That one fellow employee took his pulse but was unable to obtain any pulse. That an ambulance was immediately called and he was taken to the emergency room of the General Hospital, where you saw him shortly thereafter. (Emphasis added)
Appellant objected to this question and correctly pointed out the reasons why it was objectionable. The attorney referee reserved ruling on the objection and it is evident from his findings that he excluded this evidence. It is also evident that the commission found it to be a proper question.
This hypothetical question was clearly erroneous because of the inclusion of the underlined portion which introduces facts which were not within the witness' knowledge or in evidence. Wild v. Bass, 252 Miss. 615, 173 So.2d 647 (1965). No one has any idea as to what transpired between the time Lorensy Washington left his home and the time he was found lying on the floor of his place of employment. His usual routine is irrelevant and the witness could not take that into consideration in forming his opinion unless it was proved decedent followed that routine. The witness' opinion that the decedent's job in no way contributed to his death is without any substantial basis.
The rule is firmly established in this state when an employee is found dead at a place where his duties require him to be or where he might properly be in the performance of his duties during work hours in the absence of evidence that he was not engaged in his employer's business, there is a presumption that the accident arose out of and in the course of his employment. Winters *646 Hardwood Dimension Co. v. Harris' Dependents, 236 Miss. 757, 112 So.2d 227 (1959); Majure v. William H. Alsup & Associates, 216 Miss. 607, 63 So.2d 113 (1953).
There is absolutely no evidence that Washington was not about his master's business when he met his death. Assuming that the testimony of the doctor is sufficient evidence to support the finding by the commission that Washington died as a result of a heart attack, there is still the presumption that the heart attack resulting in death was causally connected to Washington's work activities. The question is whether the employer overcame this presumption by substantial evidence. In the case of Holman v. Standard Oil Co. of Ky., 242 Miss. 657, 136 So.2d 591 (1962), we stated the rule relative to the strength of this presumption as follows:
In the recent case of Russell v. Sohio Southern Pipe Lines, Inc., 236 Miss. 722, 112 So.2d 357, 360, 113 So.2d 667, this Court said: "it has been heretofore recognized by our decisions that there is a presumption of a causal connection between the employment and the injury or death when the onset of a heart attack occurs while the employee is about his work and engaged in the duties of his employment, and that the fatal consequences arise out of and in the course of the employment." See also Dunn's Mississippi Workmen's Compensation, 1960 Supplement, Sec. 54, P. 26, where the author says: "In the more recent cases, the presumption of causal connection, arising out of the fact that an attack occurs on the job, has increased in judicial favor to the point that it has shifted the burden of proof to the defendant and has assumed the dual effect of an inference of such strength as to require an award, as a matter of law, despite conflicting medical opinions or the absence of medical corroboration." Compare the cases there cited as documentation of the above principle. (242 Miss. at 666, 136 So.2d at 594).
The doctor assumed that Washington's employment had not contributed to his heart attack. He based this assumption on information of Washington's "usual morning routine" although there is no evidence as to what Washington did on this particular morning. If we are to indulge in assumptions it would also be logical to assume that the door stuck for some reason when Washington tried to open it and that in order for him to open the door he had to exert unusual and strenuous effort which triggered the heart attack. Then there are other assumptions favorable to the employee which could be indulged in if we are to indulge in such assumptions. It is as stated in Holman, supra:
Repeatedly this Court has held that the Workmen's Compensation Law "should be broadly and liberally construed"; that "doubtful cases should be resolved in favor of compensation"; and that "the humane purposes the act seeks to serve leave no room for narrow and technical construction." Ingalls Shipbuilding Corp. v. Howell, 221 Miss. 824, 74 So.2d 863; Central Electric Power Association v. Hicks, 236 Miss. 378, 110 So.2d 351, 112 So.2d 230, and the cases there cited. (242 Miss. at 667, 136 So.2d at 594).
The employer earnestly contends that since the majority of the commission found that it had overcome the presumption that we should affirm this case. We are of the opinion that there was no substantial evidence to support this finding. Furthermore, in Russell v. Sohio Southern Pipe Lines, Inc., 236 Miss. 722, 112 So.2d 357 (1959) this Court said:
The Court is of the opinion that under the cases of Goodnite v. Farm Equipment Company, [234 Miss. 342,], 103 So.2d 391, Poole v. R.F. Learned & Son, [234 Miss. 352], 103 So.2d 396, and particularly the case of Central Electric Power Association *647 v. Hicks, [236 Miss. 378], 110 So.2d 351, we are not bound by the decision of the Workmen's Compensation Commission in all cases where the testimony is conflicting. The writer of this opinion and two other Judges dissented in the Hicks case and also in the case of Shivers v. Biloxi-Gulfport Daily Herald, [236 Miss. 303], 110 So.2d 359, but we are nevertheless bound by the majority opinions in those cases. In the Hicks case, supra [110 So.2d 356] it was recognized in the majority opinion that "The general rule is that a decision of the commission on disputed issues of fact will be affirmed, where there is substantial and reasonable evidence in the record to support the commission's findings of fact. As an abstract statement, that rule is correct, but it means nothing apart from the statutory standards, and the judicial standards based upon the statute which have been established in a large number of cases in recent years. These standards always consist of two parts, one defining the type of questions administrative determination of which is binding upon the courts, and another which defines the type of questions that are reviewable by the courts. But either part is and should be sufficiently flexible to permit the court to check any fundamentally erroneous exercise of administrative power. And questions of fundamental importance are always open to judicial review. 42 Am.Jur. Public Administrative Law, Sec. 206. There must be an application of the pertinent statute in a just and reasonable manner."
In other words, in the Hicks case, supra, the Court held in effect that notwithstanding that the testimony is conflicting and the Commission's findings are supported by substantial evidence, this Court will nevertheless seek to ascertain whether or not the beneficent purpose of the Workmen's Compensation Law has been carried out. (236 Miss. at 731, 732, 112 So.2d at 360, 361).
Appellee cites and relies upon the case of Union Producing Co. v. Dependents of Simpson, 251 Miss. 183, 168 So.2d 808 (1964), but the rule announced in Simpson is not applicable here because we do not know what Washington was doing at the time of his heart attack. Simpson is unusual in that the facts were fully developed both as to his work activities from the time he arrived at work that morning and the cause of his death. We held that the presumption of causal connection disappeared because the facts were fully developed and that there was no substantial evidence to support a finding that his work activities caused or contributed to his heart attack. In Mississippi State University v. Dependents of Hattaway, 191 So.2d 418 (Miss. 1966) we rejected the rule announced in Simpson and held that although the work activities of Hattaway were fully developed and although he died in the presence of witnesses, the presumption of causal connection was not overcome because the cause of death was unexplained. In this case the work activities of Washington remain unexplained. In order to overcome the presumption of causal connection not only must the cause of death be explained, but the work activities of the decedent must also be fully developed to show that such activities did not cause or contribute to the heart attack.
We hold that the commission and the circuit court were in error in holding that appellee had overcome the presumption that Washington's death was causally related to his work activities. The judgment of the circuit court and the order of the commission denying appellant death benefits will be reversed. We hold that appellant is entitled to death benefits as provided in the act, but a judgment cannot be entered here because appellee properly plead apportionment. The cause will be remanded to the commission for further hearing to determine the question of apportionment.
For the reasons stated the judgment of the circuit court is reversed and this cause *648 is remanded to the commission for further proceedings consistent with this opinion.
Reversed and remanded.
All Justices concur, except SMITH and ROBERTSON, JJ., who dissent.
GILLESPIE, Presiding Justice (specially concurring).
I concur because to hold otherwise would deny claimant equal application of the workmen's compensation law. In case after case over a period of many years this Court has extended the application of the workmen's compensation act in heart cases. This writer dissented in a number of those cases, being of the opinion that except where there is some exertion, trauma, or specific emotional episode medically capable of precipitating an attack that there is no substantial causal connection between the attack and the employee's work, and when the progress of the disease happens to culminate in an attack while he is employed the death or disability is not compensable. See Miss. Ass'n of Ins. Agents v. Dependents of Seay, 218 So.2d 413 (Miss. 1969); Mississippi State University v. Dependents of Hattaway, 191 So.2d 418 (Miss. 1966); Shivers v. Biloxi-Gulfport Daily Herald, 236 Miss. 303, 110 So.2d 359 (1959); Central Electric Power Ass'n v. Hicks, 236 Miss. 378, 110 So.2d 351, 112 So.2d 230 (1959); Insurance Dept. of Miss. v. Dinsmore, 233 Miss. 569, 102 So.2d 691, Sugg. of Error Overruled, 233 Miss. 569, 104 So.2d 296 (1958).
It has been and is now my opinion that the application of the workmen's compensation act in heart cases has been extended beyond the intention of the legislature and beyond the basic purposes of the workmen's compensation act. However, I am bound by the former decisions of this Court and after Seay there is little, if any, area left to litigate in heart cases. If the act is to be evenly applied to all cases, it seems to me that all, or at least most, heart attacks by employees must be held to be compensable whether it occurs on the job or while the employee is at rest, as in Seay.
ROBERTSON, Justice (dissenting).
I respectfully dissent. Dr. Leon Lenoir, Jr., testified that his patient's death was due 100 percent to his preexisting heart disease which was progressive and of long duration, and for which condition Dr. Lenoir had been treating his patient over the years.
The following findings and opinion of the Workmen's Compensation Commission were fully and completely supported by the only medical evidence offered and received:
"(3) That the death of Lorensy Washington did not arise out of and in the course of his employment but was due solely to an underlying preexisting arteriosclerotic heart disease.
OPINION
"It is the opinion of the majority members of the Commission that the presumption of causal relationship, which arises when an employee is found dead at a place where his duties require him to be or where he might properly have been in the performance of his duties, has in this case been overcome by medical evidence." (Emphasis added).
The circuit court affirmed the order of the commission.
Dr. Lenoir testified that no conscientious doctor takes lightly the duty and responsibility of certifying the cause of death on the official certificate of death, that the doctor must be reasonably certain of the cause of death before he will certify to it. The certificate of death, filled out and signed by Dr. Lenoir, stated that the immediate cause of death was "cardiac arrhythmia, type undet." The conditions giving rise to the immediate cause of death were listed as "arteriosclerotic heart disease." *649 The duration of this disease was listed on the death certificate as six years.
Dr. Lenoir began to treat Lorensy Washington on January 6, 1959. When he first examined him, Washington had hypertensive cardiovascular disease. Dr. Lenoir testified that he had had this heart trouble for some years before he began to treat him. In fact, he found that Washington had been in the hospital for eleven days in August 1958 for heart trouble. Dr. Lenoir testified that in February 1959:
A. * * * Because of episodes that I considered heart failure, he was put back on digitalis which he had stopped after he had left the hospital. He had another increase in such symptoms in July of 1962.
Q. Did you consider that he had heart failure at that time?
A. I did. At that time he was continued on his medication, but he was given diuretics, something to move the fluid out of his lungs.
According to the testimony of the claimant, Clara Gentry Ford Washington, who was the widow of the decedent, her husband left home alone in his car at 6:30 a.m. on November 5, 1964, to go to his place of work. She testified that his hours of work for several years were from 7 a.m. to 5 p.m.
His home was a considerable number of blocks from his place of work. His usual custom was to drive to work and to park on the street opposite the shop. He would then open and walk through the gate and across the grounds to the building. He would then unlock the large metal sliding door, open it and step inside.
According to the claimant's witness, Ernest Coleman, a fellow worker, Washington had nothing further to do until 7 a.m. when he began work. Coleman testified that at 6:40 a.m. he found Washington on the shop floor just inside the sliding door, apparently dead. His hat was on the floor near his body. He had a little cut above his left eye and a little blood on his forehead. There was a little blood on the floor where he had fallen.
The shop superintendent, Lewis Bowers, was called; he tried to take Lorensy Washington's pulse, but found none. The only other testimony offered by the claimant was that of the ambulance driver, John Vaughan, who testified that he carried Washington from the shop to the hospital.
Billy Ray Whitt, the welding shop foreman, testified that he and Lorensy Washington usually arrived about the same time, that Lorensy Washington unlocked the sliding door, that the sliding door operated on rollers and could be opened with one hand.
Dr. Lenoir testified that he examined Lorensy Washington within five minutes after his body was brought to the hospital about 7 a.m. He testified at great length about Washington's heart trouble, its long history and the treatment and medicines that he had prescribed over the years. Dr. Lenoir further testified that Washington had the type of heart trouble that could have caused his death at any time regardless of what he was doing. The doctor then stated positively, unequivocally, and clearly that Lorensy Washington's death was due 100 percent to his preexisting heart condition.
The commission then made its findings and rendered its opinion based squarely on this uncontradicted testimony of the widow, the fellow workers, and the personal physician of the decedent.
We have stated in at least 100 cases since the enactment of the workmen's compensation law that the commission is the trier of the facts and that where there is substantial evidence supporting the findings of the commission, we will affirm. We have set out in no uncertain terms that when reviewing workmen's compensation cases the circuit court and this Court act as appellate courts only, that we are not super compensation commissions, and that we will not *650 take over the function of the Workmen's Compensation Commission.
Yet this Court in this case declares that the uncontradicted medical testimony of Dr. Lenoir, admittedly a well qualified and experienced internist, and the decedent's long-time doctor, does not constitute substantial evidence, is unreliable and is based on speculation and surmise.
The State of Mississippi through the State Board of Health has accepted and is satisfied with the certificate of death; it is satisfied with Dr. Lenoir's statement as to the cause of death. The certificate of death now constitutes an official record of the State of Mississippi.
In dealing with the question of admissibility of official records, Wigmore on Evidence (3rd. ed. 1940) Section 1530, p. 379, had this to say:
"It would seem that expedients which the entire commercial world recognizes as safe could be sanctioned, and not discredited, by Courts of justice. When it is a mere question of whether provisional confidence can be placed in a certain class of statements, there cannot profitably and sensibly be one rule for the business world and another for the court-room. The merchant and the manufacturer must not be turned away remediless because methods in which the entire community places a just confidence are a little difficult to reconcile with technical judicial scruples on the part of the same persons who as attorneys have already employed and relied upon the same methods. In short, Courts must here cease to be pedantic and endeavor to be practical."
This Court seems to be now adopting the rule that no doctor can certify or testify as to the cause of death unless he or some layman is actually observing the decedent during the last ten minutes of his life. The Court is converting the rebuttable presumption of causal relationship into an irrebuttable or conclusive presumption in every case in which a decedent is not under actual observation during every minute of the brief period immediately preceding a person's death.
Dunn, Mississippi Workmen's Compensation (2d ed. 1967) Section 269, pp. 355-57, has this to say about this rebuttable presumption:
"[T]he presumption should be cautiously applied and with due regard to the rationality of the connection between the death and the conditions of the employment.
* * * * * *
"Once the presumption makes its appearance in the case, it should be initially recognized as a rule of procedural law as distinguished from an inference or rule of evidence. By giving to the presumption, as such, this threshold recognition, it is characterized as a rebuttable presumption. This means that it is not conclusive and does not actually shift the burden of proof from the claimant to the defendant. It shifts only the procedural burden of going forward with the production of some evidence by way of explanation of the initially unexplained death. When all of the circumstances are in evidence, the presumption will have served its procedural purpose and the presumption, as such, will disappear from the case." (Emphasis added).
We said in Union Producing Company v. Simpson, 251 Miss. 183, 168 So.2d 808 (1964):
"We are of the opinion that there was no substantial evidence of causal connection. * * * This Court has never held that the mere presence of an employee at work is sufficient in itself to constitute causal connection. * * *
"In 1 Larson, Workmen's Compensation Law, Sec. 38.83 (1952), it is said: `There must still be an unexpected result, and there must still be an exertion  some exertion  capable medically of causing the collapse. This can by no means be taken for granted. If heart *651 failure overtakes the employee while he is merely waiting for a bus or an elevator, you simply have no strain at all to provide an accidental result of employment activity. The natural progress of the disease may bring it to its fatal climax during working hours, but if the employee's activity at the time involves no effort, or effort which cannot support medically a causal connection, it can be rightly said that the outcome was neither accidental nor causally related to the employment. It was not accidental simply because it did not happen by chance; it happened by the inexorable march of the disease.'
* * * * * *
"To hold otherwise would make every employer an insurer of his employees against heart attacks having their onset while the employee is on the job. This record overwhelmingly shows that Employee's death was the result of the natural progress of coronary insufficiency, or atherosclerosis, which reached its climax during Employee's working hours, and any connection between his work and his death was coincidental. * * *" Id. at 192-194, 168 So.2d at 812. (Emphasis added).
This case is an even stronger case than Simpson. According to the testimony of claimant's own witnesses, the decedent's hours of work were from 7 a.m. to 5 p.m. each day. He was found dead at 6:40 a.m., twenty minutes before he was to begin the day's work. The decedent's own doctor testified positively, unequivocally, and clearly that the sole cause of death was the decedent's long preexisting and progressive heart disease. Yet this Court says we cannot believe this reputable doctor on oath, and that the commission should not have believed him. I pose the question that if we cannot believe a qualified doctor when he testifies clearly, positively, and unequivocally on medical matters where he is admittedly an expert, then who can we believe?
I think that the Workmen's Compensation Commission had a right to believe this uncontradicted medical testimony and that the order of the Workmen's Compensation Commission and the judgment of the circuit court should be affirmed.
SMITH, J., also joins in this dissent.