GRIFFIS, J.,
dissenting.
¶ 13. The Mississippi Supreme Court described the “found dead” presumption in Washington v. Greenville Mfg. & Machine Works, 228 So.2d 642, 645 (Miss.1969) as follows:
The rule is firmly established in this state when an employee is found dead at a place where his duties require him to be or where he might properly be in the performance of his duties during work hours in the absence of evidence that he was not engaged in his employer’s business, there is a presumption that the accident arose out of and in the course of his employment.
In Road Maintenance Supply, Inc. v. Dep. of Maxwell, 493 So.2d 318, 321 (Miss.1986), the court held that the presumption would disappear upon “credible evidence that the deceased employee’s work ‘activities did not cause or contribute to the heart attack.’ ” In Johnston v. Hattiesburg Clinic, P.A., 423 So.2d 114, 119-20 (Miss.1982) the court ruled:
In order to overcome the presumption of causal connection not only must the cause of death be explained, but the work activities of the decedent must also be fully developed to show that such activities did not cause or contribute to the heart attack.
¶ 14. In this case, the Commission failed to consider several undisputed facts. These facts clearly support Baptist’s position that the “found dead” presumption was rebutted and that Frank Mullett’s death was not caused by or contributed to through his employment.
¶ 15. In overturning the administrative law judge’s decision, the Commission first concluded that Mr. Mullett’s activities were not accounted for during the sixty to seventy-five minutes prior to his death. Next, the Commission concluded that no credible medical expert testimony was presented to show that Mr. Mullett’s death was not caused by work-related activities. Both of these conclusions are contrary to the evidence in the record.
¶ 16. First, Johnston provides that, for the presumption to be overcome, Mr. Mul-lett’s activities immediately preceding his death must be “fully developed.” Id. The Commission’s order repeatedly states that his activities were not accounted for during the sixty to seventy-five minutes prior to his death. This conclusion is simply not supported by the record. Indeed, there was detailed evidence of what Mr. Mullett did from the evening before through the time of his death, at approximately 1:30 p.m. on January 12th.
¶ 17. The record reveals that Mr. Mul-lett was experiencing difficulty contacting his personal physician, Dr. Bob May, to obtain a prescription refill. Dr. May had previously treated Mr. Mullett for his high blood pressure and prescribed medication. In the days prior to his death, Mr. Mullett complained that he was not able to reach Dr. May to refill his high blood pressure medication prescription.
*619 ¶ 18. The evening before his death, January 11th, Mr. Mullett complained to his wife that it had been a “tough day.” From 6:00 until 10:00 p.m. that evening, Mr. and Mrs. Mullett painted their bedroom in anticipation of the arrival of new furniture the next day. They had moved their furniture out of their bedroom and were “roughing” it until the new furniture arrived.
¶ 19. On the morning of January 12th, according to Mrs. Mullett, Mr. Mullett seemed a little bothered and commented that he needed to get the prescription from Dr. May. He did not complain about any headaches or a high reading on his blood pressure monitor, but his Day Timer indicated that he had called Dr. May at home that morning. Mr. Mullett went to work at 7:00 a.m. He had a 10:00 a.m. meeting. After the meeting, he went to workout at the fitness center. He returned to his office around noon. From noon until he began experiencing problems, at approximately 1:15 p.m., he was in or around his desk and cubicle.
¶ 20. Paula Katherine McCormack, a registered nurse, testified that she worked in the office with Mr. Mullett, and she attended the 10:00 a.m. meeting. She testified that there was nothing significant about the 10:00 meeting, and said it had been a “nice meeting.” She testified that her desk was about fifty feet from Mr. Mullet’s desk. She said they were in the same office, but different cubicles. She testified that Mr. Mullett came to her cubicle, sat and spoke with her about ten or fifteen minutes prior to his collapse. She remembered that time to be approximately 1:00 p.m. She testified they were joking around, and she did not see anything physically wrong with Mr. Mullett. Their visit lasted approximately three or four minutes. Ms. McCormack was the first medical professional to respond and treat Mr. Mullett once he began experiencing problems.
¶21. Norval Yerger testified that his desk was next to Mr. Mullett’s desk, only separated by a partition. Mr. Yerger testified that he was with Mr. Mullett at the 10:00 a.m. meeting and that Mr. Mullett left to go to lunch at about 11:00 a.m. He too testified that it was a “good meeting.” He testified that some of the meetings had been stressful, but Mr. Mullet had accomplished several things and his supervisors were pleased. Mr. Yerger testified that “we all felt good about the meeting.” Mr. Yerger testified that Mr. Mullett returned to the office around noon and went to his desk. Mr. Mullet told Mr. Yerger that he had been at the gym during lunch and that it was a “rough workout.” Mr. Yerger could hear Mr. Mullett sit down in his cubicle and make a telephone call. Mr. Mullett was on the phone when Mr. Yer-ger heard him began to wheeze. Mr. Yer-ger testified:
Then I heard him making a strange sound, kind of a wheezing sound. At first I thought he was laughing and then it kept on. And I said, “Frank are you all right?” And he didn’t answer. And so I kind of got up and looked, and he was slumped back in his chair like this, you know, like he was — something was wrong with him.
Mr. Yerger called Ms. McCormack for assistance.
¶ 22. The testimony of these witnesses chronicle Mr. Mullett’s activities up to the moment he collapsed. From approximately noon until he began experiencing problems at 1:15 p.m., Mr. Mullett was either talking with or in the immediate vicinity of his co-workers. None of the co-workers could indicate any stressful event or problem that could have caused or contributed to Mr. Mullett’s death. The Commission’s conclusion that sixty to seventy-five min *620 utes prior to Mr. Mullet’s death were unaccounted for is not based on the evidence presented.
¶ 23. Second, the Commission held that no “credible expert medical testimony” was presented by the employer which rebuts the “found dead” presumption. Dr. James L. Crosthwait, a board-certified internist and specialist in cardiology, testified by deposition. Although he did not examine Mr. Mullett prior to his death, Dr. Crosthwait reviewed Mr. Mullett’s medical and employment records and determined that Mr. Mullett “suffered from sudden death syndrome.” Dr. Crosthwait testified that the most likely cause of this was “sudden failure of the heartbeat.” He also testified that Mr. Mullett’s job did not contribute to his death finding that “the job did not cause or contribute to his heart disease or to the sudden death episode.” Dr. Crosthwait testified that the more likely cause of death was high blood pressure, concluding that “[pjoorly controlled hypertension is a risk factor for a heart attack and sudden death.” Dr. Crosthwait’s testimony refutes the Commission’s determination that “no credible medical testimony” was presented by the employer to rebut the “found dead” presumption. Dr. Crosthwait’s opinion was credible medical evidence that Mr. Mullett died from an non-work related heart condition.
¶ 24. These two elements combined with the evidence that Mr. Mullett was suffering from high blood pressure, the testimony of all of his co-workers that the day in question was not a stressful one, and the evidence that Mr. Mullett’s stress level had tapered off clearly demonstrate that the judgment of the Commission was not supported by substantial evidence.
¶25. This case is analogous to Union Producing Co. v. Simpson’s Dependents, 251 Miss. 183, 168 So.2d 808, 808 (1964). In Union Producing Co., the employee died at work of a heart attack. Id. at 187, 168 So.2d at 809. The employer presented evidence of a pre-existing condition, provided details of the employee’s work, and developed the facts until the employee’s death. Id. at 194, 168 So.2d at 813. The supreme court held:
Since the Employee was not under any mental strain resulting from his work, and the physical efforts of his job, in the words of claimant, required him to lift nothing heavier than a pencil and a piece of paper, it cannot be said that there is any substantial connection between his terminal heart attack and his employment.

Id.

¶ 26. Here, Baptist presented “credible evidence” that Mr. Mullett’s work activities did not cause or contribute to his death. Road Maintenance Supply, Inc., 493 So.2d at 321. For the presumption to disappear, Mississippi law does not require the employer to prove this by clear and convincing evidence or by a preponderance of the evidence. Instead, the presentation of “credible evidence” is sufficient for the presumption to disappear. Id. See also Washington v. Greenville Manufacturing & Machine Works, 223 So.2d 642, 647 (Miss.1969) (“found dead” presumption disappears if credible evidence exists that the deceased employee’s work activities did not cause or contribute to the heart attack) (also cited and quoted with approval in Johnston v. Hattiesburg Clinic, P.A., 423 So.2d 114, 119-20 (Miss.1982); Alexander v. Campbell Construction Company, 288 So.2d 4, 5 (Miss.1974); McCarley v. Iuka Shirt Co., 258 So.2d 421, 422 (Miss.1972); City of Okolona v. Dependent of Harlow, 244 So.2d 25, 26 (Miss.1971)).
¶ 27. Accordingly, the Commission clearly erred in determining that Baptist did not satisfactorily rebut the “found dead” presumption to show that Mr. Mul- *621 lett’s death did not arise out of or in the course of his employment. For these reasons, I disagree with the majority’s decision and dissent.
IRVING and CHANDLER, JJ., join this separate opinion.