455 So.2d 713 (1984)
Attina Marie CANNADAY
v.
STATE of Mississippi.
No. 54982.
Supreme Court of Mississippi.
May 16, 1984.
Rehearing Denied September 12, 1984.
*715 Evelyn Floyd, Shannon Waller, Jr., Gulfport, for appellant.
Bill Allain, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, Albert Necaise, Gulfport, for appellee.
En Banc.
PRATHER, Justice, for the Court:
This capital murder conviction presents for review two questions. The first is whether Attina Marie Cannaday's constitutional right to counsel at the time incriminating statements were obtained from her while in custody in the county jail was violated. The second question is, if her constitutional rights were violated, whether such violation requires reversal for the guilt and sentence phase of her conviction.
Attina Marie Cannaday, a sixteen year old divorcee, was convicted in Harrison County Circuit Court of the kidnap and murder of Air Force Sergeant Ronald Wojcik and was sentenced to death by the jury. Cannaday appeals asserting that the trial court committed errors as follows:
(1) In excluding prospective jurors in violation of the principles set forth in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (1968);
(2) In restricting cross-examination as to the probationary status of the state's primary witness;
(3) In prohibiting relevant expert psychiatric testimony offered on behalf of appellant;
(4) In allowing incriminating statements of appellant elicited from her in violation of her rights guaranteed under Fifth and Sixth Amendments to the United States Constitution of right to counsel; and
(5) In failing to instruct the jury on lesser included offense of kidnapping violated appellant's rights to due process under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.
Additional errors from the sentence phase of the bifurcated trial assigned are:
(6) The death sentence in this case is unconstitutional because it was the result of an improperly and inadequately instructed jury.
(7) The imposition of the death penalty on a sixteen year old child at the time of the crime constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments.
(8) The execution of Attina Cannaday, in view of overwhelming mitigating circumstances, would be disproportionate under Mississippi law and the Eighth Amendment.
After conviction and perfection of an appeal to this Court, Cannaday filed a petition for writ of error coram nobis in the Harrison County Circuit Court. Upon conclusion of the hearing, the circuit judge concluded that the circuit court was without jurisdiction to entertain the petition for writ of error coram nobis pending appeal of the initial conviction to this Court. The denial of the writ of error coram nobis is also on appeal here for the trial court's failure to vacate the death sentence when the sentence was based on alleged perjurious, and subsequently recanted testimony, of the state's primary witness, the co-indictee in this crime.

I.

FACTS
In the early hours of June 3, 1982, twenty-six year old Ronald Wojcik was the victim of kidnapping and murder. His girl-friend, Sandra Sowash, was kidnapped with him and raped. The three principals were the defendant Attina Marie Cannaday, her friend David Gray, and another, Dawn Bushart.
Ms. Cannaday was an Alabama runaway child from a broken home at age thirteen who married and divorced at age fourteen. She worked in numerous bars in Gulfport and Biloxi as dancer and barmaid and supplemented her income by prostitution. Cannaday met Wojcik at the Sports Page Bar where he "moon-lighted" after his duties at Keesler Air Force Base.
*716 Wojcik was divorced from his wife, but frequently kept his two children of his marriage. Cannaday began living with Wojcik, and they ostensibly conducted themselves as a married couple for several weeks until he learned her true age. Realizing that the military disapproved of this relationship, Wojcik required Cannaday to move. Shortly afterwards Wojcik found a new girl-friend, Sandra Sowash.
On May 22, 1982, Cannaday met with a man named John Cooper, who was an acquaintance of Wojcik. Cannaday told Cooper that she had caught Wojcik and Sowash in bed together and had threatened to kill Wojcik if she caught them again. Cannaday denied the threat, but admitted discussing the situation with Cooper. Cooper advised Wojcik of the threats, but he seemed not to be bothered. Wojcik did tell Cooper that on the night before (May 21) Cannaday showed up outside his apartment, yelling obscenities.
On June 1, 1982, Cannaday made a phone call to a friend, Gena Pecoul. During that conversation she expressed her love for Wojcik, but also expressed a desire to kill him.
Cannaday lived at several locations after her removal from Wojcik's apartment. She became a friend with David Gray, an unemployed young man who lived out of his automobile. They discussed Cannaday's feelings for Wojcik and her dislike for Sowash.
On the night of June 2, the date preceding this crime, Cannaday was at the Red Garter Lounge at the Buena Vista Hotel. She and David Gray drank and danced. Both were fairly intoxicated, and Gray had smoked some marijuana. Also at the lounge was Dawn Bushart, a girl Cannaday referred to as "the ugly fat girl." Her name was not known until after the crime. Bushart joined Cannaday and Gray. As the lounge was closing, Cannaday asked Gray if he would go with her to her "old man's apartment with her to get her van and some clothes." Gray's story was that Cannaday wanted him to beat Wojcik to scare him and further to kill Wojcik, to which he refused. Cannaday denied this and denied asking Gray if he had a gun. Gray did not have a gun, but took four knives from his car, as Cannaday put it, "in case we got picked up by a nut." Since Gray's car was not operative, the three  Cannaday, Gray and Bushart, hitchhiked westward. Someone picked them up and took them to a point near Wojcik's apartment.
Seeing Wojcik's white van, Cannaday knew he was home. They approached the apartment, and Gray gave Bushart a knife and gave Cannaday a black handled knife. Gray kept a butcher knife and a fourth knife which was strapped to his belt. Gray ordered Bushart to stand out on the front porch.
Cannaday and Gray entered the apartment. The testimony was disputed as to whether the door was unlocked or whether Cannaday had a key. Cannaday gave her knife to Gray and entered Wojcik's bedroom while Gray remained in the living room. Wojcik and Sandra Sowash were asleep in bed as Cannaday entered.
The scene that transpired at the apartment was destructive and forceful. The encounter ended with Wojcik and Sowash being forced at knifepoint to get in Wojcik's van. Wojcik's two children who were asleep in the other bedroom were left behind. As they were leaving the apartment, Cannaday picked up a wallet belonging to Wojcik. The first time that Bushart was seen by either of the victims was when they stepped outside to get into the van.
With Cannaday driving, they proceeded westward along U.S. 90 at a pretty fast rate of speed. After making a right turn off of U.S. 90, Cannaday attempted to race an approaching train, but moments before getting to the tracks, Wojcik grabbed the wheel and prevented the collision with the train. Gray told Bushart that if Wojcik moved again to cut him.
Both Gray and Sowash stated that Cannaday suggested that Gray have sex with Sowash. Gray forced Sowash to have sexual *717 relations with him while Cannaday continued to drive.[1]
After making several turns, Cannaday decided to stop on a gravel road known as Lampkin Road, somewhere north of Biloxi. Gray got out of the van and forced Wojcik out. Wojcik urged Cannaday to discuss the situation with him, but Cannaday refused. Gray had the butcher knife and another knife strapped to his belt. There was a conflict as to who had the black handle knife, Sowash saying that Cannaday had it, and Cannaday saying that Bushart had it.
Gray forced Wojcik into the woods; this was the last time Wojcik was seen alive.
At this point, the facts are in sharp dispute. David Gray's testimony denied any stabbing of Wojcik. His version of the events was that after entering the woods, Gray was distracted by Cannaday who had shouted his name. Wojcik took this opportunity to hit Gray, and a fight occurred. Gray over-powered Wojcik, but had dropped the knife during the fight. After hitting Wojcik until he was nearly unconscious, Gray began looking for his knife. As he was looking, Cannaday walked up and advised him that Sowash had run away and that she had thrown the knife at her. Gray found his knife, and Cannaday asked for it. Gray gave Cannaday the knife and left her in the woods as he walked back to the van. At the van, Gray smoked a Kool cigarette. A Kool cigarette butt was later found several feet from a place where the van was thought to have been. It was Gray's belief that when he left Wojcik in the woods, Wojcik was still alive. When Cannaday returned to the van, she did not have the knife. She said that nothing happened, and they left.
To the contrary, however, it was Cannaday's version that she never went into the woods, but stayed at the van with Sowash and Bushart the entire time. Also, it was Bushart who threw the knife at Sowash as Sowash was escaping. Cannaday testified that Gray had blood on his clothes and on the knife upon return to the van. She thought that he had killed Wojcik. Gray became upset when he discovered that Sowash had gotten away. The three left in the van and went to Slidell, Louisiana with Cannaday driving.
While traveling, Gray discarded his bloody tee-shirt. Upon arrival at a store near Slidell, Cannaday bought a black tee-shirt which she put over her red/pink jumpsuit.
Cannaday and Gray went to the residence of Mrs. Mildred Page Robinson and her son Timothy Page, acquaintances of Cannaday when Cannaday and her ex-husband lived in a nearby trailer park. Page noticed Cannaday with the black tee-shirt pulled over the jumpsuit. He did not notice any blood on Cannaday. Cannaday told him they had come to "party," and asked for some cut-off jeans to wear.
Cannaday removed her red/pink jumpsuit and placed it in water to soak. Cannaday's explanation for this was that she had started her menstrual period, and as a result the outfit needed to be soaked. Page did notice blood stains on one of Gray's arms and one of his pants leg. Gray was not wearing a shirt.
After talking with Mrs. Robinson for a few moments, Cannaday went to sleep. She did not bath or clean up before going to sleep other than wash her red/pink outfit. Gray and Page got into the van and left in search of a keg of beer.
Returning to the scene of the crime, when Sandra Sowash was able to escape, she found a nearby house from which she notified Harrison County Sheriff's Department.
At sunrise the body of Wojcik was found with nineteen stab wounds in the face, neck, chest and back areas, laying in a bushy wooded area some fifty feet from the road. However, the butcher knife was never found.
*718 A detailed description of the white van was given by Sowash, as well as the name of Tina Cannaday, as a participant. Wojcik's wallet was found on the highway near Slidell, and the sheriff's deputies were aware that Cannaday once lived in Slidell, Louisiana. They notified the Louisiana authorities to be on the lookout for the white van and occupants.
In Louisiana the white van was spotted. Gray and Timmy Page were arrested.
Information obtained from Page and other information led the police to Mrs. Robinson's home where Cannaday was asleep. She was awakened, arrested and warned of her constitutional rights. Investigators Al Herman of the St. Tammany Sheriff's Department, seized the outfit that Cannaday had put in the sink. The water had already drained out, and Herman noticed no blood on the clothing. Articles of jewelry later identified as belonging to Sowash and Wojcik were also recovered.
Cannaday was placed in a sheriff's car for transportation to the St. Tammany Sheriff's Department. At that point in time, she had been twice warned of her Miranda rights. During the car ride, Cannaday made unsolicited statements that Gray had used the knife to kill Wojcik and that she saw Gray grasp Wojcik's hair, pull his head back and cut his throat.
After arriving at the police station, Cannaday was criminally charged. In the presence of Harrison County Officers Martin and Johnson, she gave a fourteen page statement concerning her involvement in the crime, which story she also reflected at trial. Upon waiver of extradition, Cannaday and Gray were returned to Mississippi. After hitchhiking back from Louisiana, Bushart was arrested while walking along Highway 90 in Harrison County.
After incarceration, Cannaday stated to Officer Warden that she believed she was pregnant and that Wojcik was the father. She stated she had not had a menstrual period for three months.
Officer Jim Wren confirmed that a pregnancy test was given to Ms. Cannaday which was negative. Cannaday explained that the officers misunderstood her statements concerning her periods. She stated that she had missed two periods prior to June 3rd, but on the day of her arrest her menstrual period had started.
Blood tests made by Larry Turner of the Mississippi State Crime Lab indicated that both Wojcik and Gray had type B blood. Blood spots found on Gray's pants were type B blood. Turner also tested the red/pink jumpsuit, which was worn by Cannaday. Those tests revealed the enzyme paradoxin in six areas which indicated possible blood traces. The stains, however, were insufficient to get a blood type. There were no traces in the crotch area of the clothing. Turner said that the finding of small traces was consistent with the garment having been washed.
Cannaday, Gray and Bushart were indicted for capital murder for the kidnapping and homicide of Wojcik, but tried separately. David Gray's trial preceded Cannaday's; after his conviction, Gray testified against Cannaday and maintained his position of innocence of any murder. Bushart claimed the constitutional privilege against self-incrimination and did not testify in either of the trials. She later pled guilty to manslaughter. Attina Marie Cannaday was found guilty of capital murder and sentenced to death.

II A.

GUILT/INNOCENCE PHASE
The first assigned error addresses exclusion of prospective jurors in violation of the principles set forth in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). (Exclusion of juror where unmistakably clear that the juror would automatically vote against death penalty without regard to any evidence developed at trial.)
Two jurors were excused in the case sub judice for their belief concerning imposition of the death penalty on a sixteen year old. However, no contemporaneous objections *719 was made when these two witnesses were excused.
Since no objection was made, this issue is not properly preserved for review before this Court. Ratliff v. State, 313 So.2d 386 (Miss. 1975); Pittman v. State, 297 So.2d 888 (Miss. 1974); Myers v. State, 268 So.2d 353 (Miss. 1972).
However, even if the issue was properly preserved for appeal, the assignment would be without merit.
Both prospective jurors answered that they would not be able to vote for the death penalty regardless of what the evidence showed because of the youthful age of Cannaday. If prospective jurors could not follow the law and the evidence and render a death penalty where warranted, they would not have been a fair juror to the state. Evans v. State, 422 So.2d 737 (Miss. 1982); Irving v. State, 361 So.2d 1360 (Miss. 1978); Witherspoon v. Illinois, supra. Attempts by counsel to rehabilitate the testimony of the prospective jurors was not successful, and they were properly excused by the trial court. Therefore, even if the action of the trial judge was objected to at trial and that objection properly preserved for appellate review, the assignment would be meritless.

B.
Did the trial court err in restricting cross-examination as to the probationary status of the state's primary witness, David Gray?
During David Gray's cross-examination by the defense, Gray was asked about his three prior convictions. Thereafter, defense counsel attempted to ask Gray about his probationary status as follows:
Q. You were on probation at the time you were arrested.
BY MR. NECAISE: Object to that, If The Court Please. He can't go into that.
BY THE COURT: Sustained.
Defense counsel relies upon the Sixth Amendment, United States Constitution's guarantee of the right to confront witnesses and Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) for support of this assignment. Mississippi Constitution, Article 3, Section 26, is the basis in Mississippi's jurisprudence for the assertion of this constitutional right to confront witnesses in criminal prosecutions.
Cannaday's argument is that the Sixth Amendment right to confrontation of witnesses requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias derived from the witness's probationary status.
The Davis case, supra, upon which defense relies involved the testimony of a juvenile who was on probation. Defense counsel argued that the probationary status was proper evidence to attack a witness's credibility as revealing biases, prejudices, or ulterior motives. The United States Supreme Court said:
We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.
(415 U.S. at 316, 94 S.Ct. at 1110).
We acknowledge this principle as constitutionally guaranteed. Factually, however, Davis v. Alaska is distinguishable from the case sub judice. Here, it was known to the jury that Gray was previously sentenced to death for his involvement in this crime. He was not on probation, but in jail. After receiving the ultimate death sentence, Gray's previous probationary status from other crimes would not be relevant in Cannaday's trial. In the Davis case the juvenile was not incarcerated, but was on probation. Therefore, the case sub judice is distinguishable from the Davis v. Alaska both in the facts and reasoning.
The case law of this state holds that a witness can be impeached by showing a prior conviction. Anything less than a final judgment conclusively establishing guilt cannot be used. Murphree v. Hudnall, 278 So.2d 427 (Miss. 1973). Examination *720 of the prior convictions was permitted by the trial judge.
The Sixth Amendment right to confrontation was satisfied in the case sub judice since the defendant was adequately allowed "to expose to the jury the facts from which jurors as the sole trier of fact and credibility could appropriately draw inferences relating to the reliability of the witness. "United States v. Balliviero, 708 F.2d 934, 938 (5th Cir.1983); Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347, 355. We find no restriction on cross-examination that requires reversal in this assignment.

C.
Did the court err in prohibiting defense counsel from eliciting certain testimony from the two psychiatric experts called by the defendant?
Two experts, one a psychologist and the other a psychiatrist, were called by the defendant. Both of these experts had been appointed by the court to conduct mental examinations of the defendant and both testified that Ms. Cannaday knew right from wrong under the M'Naughten test. Edwards v. State, 441 So.2d 84 (Miss. 1983).
Ms. Cannaday's intelligence quotient was testified to be a borderline mental retardation level with a score of between 60 to 84, and a mental age of 9.8 years. To counter the state's case of her knowing participation in this crime, the defense sought to show Cannaday's limited mental ability through the expert psychiatric testimony.
Defense counsel posed two hypothetical questions to the clinical psychologist, both of which contained facts not in evidence. The first such question contained a reference to Cannaday's having "smoked marijuana," and the second question was conditioned on Cannaday's "crying" and being "upset." Neither fact was in evidence. The posing of a hypothetical question based upon facts not in evidence was properly objected to, and the court's action in sustaining the objection was proper. Cadillac Corp. v. Moore, 320 So.2d 361 (Miss. 1975); Washington v. Greenville Mfg. and Machine Works, 223 So.2d 642 (Miss. 1969); Prewitt v. State, 106 Miss. 82, 63 So. 330 (1913).
Additionally, the defense counsel asked of the expert:
(1) Based upon (your) professional opinion was Cannaday capable of plotting the murder ... and inducing a casual friend, David Gray, to commit the murder?
(2) (Based upon the evidence) do you think she was able to understand the severity of the situation she was in?
In the recent case of Edwards v. State, 441 So.2d 84 (Miss. 1983), this Court discussed the insanity defense as applied in a capital murder case, where sanity was an issue. This Court continued to apply the M'Naughten rule as the test on this issue, i.e. whether the defendant knew right from wrong at the time the crime was committed. Sanity is not an issue in the case sub judice. It is undisputed that the defendant knew right from wrong. The defense was trying to assert a diminished capacity defense in this case, which is not a defense to a criminal charge in this state. Edwards, supra. Hill v. State, 339 So.2d 1382 (Miss. 1976), Laney v. State, 421 So.2d 1216 (Miss. 1982).
While the question as to whether Cannaday understood the severity of the situation she was in might be probative on the issue of knowingly waiving Miranda rights, it should have no relevance as to guilt or innocence under this state's present rules.
It is the opinion of this Court that no error was committed here.

D.
Was the trial court in error in permitting incriminating statements made by Cannaday in response to a question of a deputy sheriff/jailer a violation of her constitutional rights to counsel under the Fifth and Sixth Amendments to the United States Constitution.
*721 The two issues here are: (1) was Cannaday's constitutional right to counsel violated? (2) if so, does the violation require reversal of both her guilt and sentence trials?
Ronald Mason, deputy sheriff and jailor at the Harrison County Jail, became acquainted with Tina Cannaday after she was incarcerated. Counsel had been appointed for her. About three days after Cannaday had her preliminary hearing, Mason was within the jail with a trusty to remove garbage. Over defense objection, Mason testified:
(W)hen I got to the door Tina Cannaday and Susan Warden were standing by the door laughing and joking, so I got to talking to them. I understood they were talking about murder, so I asked Tina, I said "Tina, did you kill him"? She did not say she killed him, she did not say that David Gray or anybody else killed him. But she did say "after the head was cut back, I took the head and shook it and tried to break it off", that she wanted to keep the head. Susan Warden was a witness to this.
However, Susan Warden related a somewhat different version of the statements. Warden testified that Cannaday responded to Officer Mason's question by saying that she did not kill Ronald Wojcik but that she should have taken his head off and brought it home. Warden stated that Cannaday did not say that she shook Wojcik's head and tried to take it off.
Cannaday, while on cross-examination during the sentencing phase of the trial, did not remember telling Officer Mason about Wojcik's head. Nor did Cannaday remember telling Susan Warden that she wanted Wojcik's head. But she admitted she probably did say it. She did state that she did not go out into the woods and shake Wojcik's head.
The error assigned on appeal is that this statement was elicited from Ms. Cannaday in violation of her U.S. constitutional rights under the Fifth and Sixth Amendments. The state argues that the Fifth and Sixth Amendment right objection was not made at trial, and therefore, it is procedurally barred and not before this Court.
In reverse order, we address the state's contention on this assignment that the question is procedurally barred for failure of the defense to timely object based on the grounds of the Fifth and Sixth Amendments. Hill v. State, 432 So.2d 427 (Miss. 1983); Williamson v. State, 330 So.2d 272 (Miss. 1976); Stringer v. State, 279 So.2d 156 (Miss. 1973).
However, this Court is compelled to note that objection was repeatedly made by defense counsel although not based on the specific ground of the right to counsel.
The first objection made was that the statement was immaterial, prejudicial, inflammatory and improper rebuttal. The trial judge ruled that it was proper rebuttal since it was offered in proof of Cannaday's intent to kill Wojcik, which she denied. The second objection made to the statement was on the basis that the statement was hearsay. The third and the last objection was a renewal of the earlier objections. Further argument against this statement was made on the motion for a new trial, based upon hearsay grounds.
Although counsel was not as articulate in his first objection of "prejudicial" or "inflammatory" as he might have been, the objection was made, and the repeated objections cannot be ignored where fundamental constitutional rights are involved. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed. 246 (1964). The gravity of this statement is evidenced by the fact that on the motion for a new trial, Judge Griffin stated: "I think that part about the head is probably what brought the death sentence." In view of defense counsel's objection, we address this issue on its merits in this capital murder case.
The constitutional basis for defendant's position is twofold. The United States Constitution, Amendment V, provides that "(N)o person shall be held to answer for a capital ... crime, ... nor shall be compelled in any criminal case to be a witness *722 against himself, ... without due process of law... ."
Secondly, defense relies upon the Sixth Amendment to the United States Constitution providing that "(I)n all criminal prosecutions, the accused shall enjoy the right to ... have the assistance of counsel for his defense." The Sixth Amendment rights are applied to state prosecutions through the Fourteenth Amendment of the United States Constitution. Watson v. State, 196 So.2d 893 (1967), Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).
Mississippi jurisprudence has the same constitutional, and statutory provisions, and rules guaranteeing these same rights. Mississippi Constitution Art. 3, Section 26 provides that "(I)n all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both, ... and he shall not be compelled to give evidence against himself; ..." Also, see Mississippi Code Annotated section 99-15-15 (1972) and Mississippi Criminal Rules of Procedure, Rule 1.03, 1.05.
Since the Mississippi jurisprudence provides an adequate and equal basis for these constitutional rights, we base our opinion herein on Mississippi law, notwithstanding the fact that reference is made to federal cases. The federal cases are used for the purpose of guidance, but Mississippi jurisprudence compels the result. Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).
Intertwined in this assignment are two federal constitutional amendments relating to the right to counsel which need to be distinguished.
The Fifth Amendment right addressed here is the privilege against self-incrimination. The Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) decision is considered to be a Fifth Amendment decision although it interweaves both Fifth and Sixth Amendment rights. Included within the so-called Miranda rights is the right to assistance of counsel. Miranda, supra. Cannaday was afforded counsel; she was also repeatedly given her Miranda warnings prior to counsel appointment. These facts are undisputed.
However, the Sixth Amendment right to counsel has broader ramifications. The accused's right to counsel, once that right has attached, is a broad guarantee that the accused "need not stand alone against the state at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." United States v. Wade, 388 U.S. 218, 226, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967).
The time at which the right to counsel attaches to a defendant is when adversary proceedings have been initiated, whether by way of formal charge, preliminary hearing, indictment, information or arraignment. Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).
In Mississippi, commencement of prosecution is governed by Mississippi Code Annotated section 99-1-7 (1972) where prosecution can be commenced "by the issuance of a warrant or by binding over or recognizing the offender to compel his appearance to answer the offense, as well as by indictment or affidavit." See also, State v. Hughes, 96 Miss. 581, 51 So. 464 (1910). Without dispute counsel was appointed in the case sub judice, and criminal proceedings had begun. The right to counsel had attached in Cannaday's case.
Once this right has attached in a criminal case interrogation may not commence without the express waiver by the defendant of the right to counsel. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Nor may the police undertake interrogation in the absence of the attorney for the defendant if the attorney has expressly forbidden it. Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).
In discussing waiver the Supreme Court stated in Brewer, supra:
(T)hat it was incumbent upon the State to prove "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. *723 at 464 [58 S.Ct. at 1023]. That standard has been reiterated in many cases. We have said that the right to counsel does not depend upon a request by the defendant, Carnley v. Cochran, 369 U.S. 506, 513 [82 S.Ct. 884, 888, 8 L.Ed.2d 70]; cf. Miranda v. Arizona, 384 U.S. at 471 [86 S.Ct. at 1626] and that courts indulge in every reasonable presumption against waiver, e.g., Brookhart v. Janis, supra, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314, at 4; Glasser v. United States, 315 U.S. 60, 70 [62 S.Ct. 457, 464, 86 L.Ed. 680]. This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings. Schneckloth v. Bustamonte, 412 U.S. 218, 238-240 [93 S.Ct. 2041, 36 L.Ed.2d 854]; United States v. Wade, 338 U.S. at 237 [87 S.Ct. at 1937].
Again, in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court discussed waiver of the right to counsel, stating:
It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing abandonment of a known right or privilege, a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Johnson v. Zerbst, 304 U.S. 458, 464, 82 L.Ed. 1461, 58 S.Ct. 1019 [1023], 146 A.L.R. 357 (1938).
451 U.S. 482, 101 S.Ct. 1884, 68 L.Ed.2d 385. In footnote 8 of the Edwards opinion the Court stated:
In Brewer v. Williams, 430 U.S. 387, 51 L.Ed.2d 424, 97 S.Ct. 1232 (1977), where, as in Massiah v. United States, 377 U.S. 201, 12 L.Ed.2d 246, 84 S.Ct. 1199 (1964), the Sixth Amendment right to counsel had accrued, the Court held that a valid waiver of counsel rights should not be inferred from the mere response by the accused to overt or more subtle forms of interrogation or other efforts to elicit incriminating information. In Massiah and Brewer, counsel had been engaged or appointed and the admissions in question were elicited in his absence.
451 U.S. 484, 101 S.Ct. 1884, 68 L.Ed.2d 386.
The court noted, however, that a defendant may waive his rights to counsel,[2] at least under the Fifth Amendment, where he initiates the meeting with the authorities and then gives statements. Such statements are admissible.
In the case sub judice, both Officer Mason and Susan Warden testified about a solicited statement that Cannaday made in response to a question asked by a person whom she knew was a sheriff's deputy (Mason).
The statement made to Officer Mason in response to his question was made at a time when the Sixth Amendment right to counsel had attached. Since the question was made without the benefit of the presence of her attorney, Cannaday's Sixth Amendment rights were violated.
We next address the violation to determine if the entire trial is vitiated.
Analyzing the response from Cannaday reveals that neither witness said she killed Wojcik. One statement placed her in the woods shaking the victim's head; one denied that she was shaking the head. The statement which placed her in the woods inferred that she killed Wojcik.
However, taking the testimony as a whole here, the Court holds that the evidence of Cannaday's guilt as a principal to the kidnap and murder is so overwhelming that the jury could have reached no other conclusion.
In United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), the United States Supreme Court has held that the violation of a Fifth Amendment guarantee was not error per se if "on the whole record, the error was harmless beyond a reasonable doubt." Citing Chapman *724 v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring automatic reversal of the conviction.
(386 U.S. 22, 87 S.Ct. 827, 17 L.Ed.2d 709)
This Court holds the Sixth Amendment right to counsel was violated, but declare that such error was harmless on the guilt phase in view of the overwhelming evidence presented against Ms. Cannaday. Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); United States v. Metcalfe, 698 F.2d 877 (7th Cir.1983).
Turning to the sentence phase, however, we cannot so hold. Counsel objected to this statement for its prejudicial and inflammatory nature. The record reflects the trial judge's statement that the "head remark" brought the death penalty. We also conclude that this violation of the defendant's Sixth Amendment right to counsel so infected the sentence phase that reversal of that phase must be ordered.
This court reverses the sentence phase and remands for a new sentence phase trial.

E.
We answer the fifth assignment of error since we affirm the guilt phase.
Was it error to refuse to instruct the jury on the lesser included offense of kidnapping?
The following instruction was refused by the trial court at the conclusion of the guilt phase of the trial to which defense took exception.
INSTRUCTION NO. 16
The Court instructs the Jury that if the Jury can deduce from the facts and circumstances surrounding the case, either from the evidence or lack of evidence, reasonable facts consistent with the Defendant's guilt of a lesser offense than Capital Murder, then there is a reasonable doubt of her being guilty of Capital Murder, and the jury should return the following verdict:
"We, the Jury, find the Defendant not guilty of Capital Murder, but we do find the Defendant guilty of Kidnapping," in which event it will be the duty of the Court to sentence the Defendant as provided by law.
A "lesser included offense" is defined as "one composed of some, but not all, of the elements of the greater crime, and which does not have any element not included in the greater offense." Black's Law Dictionary, p. 812 (5th ed. 1979). State v. Stewart, 292 So.2d 677 (La. 1974).
The instruction of a lesser included offense where warranted by the evidence is warranted. Jackson v. State, 337 So.2d 1242 (Miss. 1976), Johnson v. State, 416 So.2d 383 (Miss. 1982).
In Jones v. Thigpen, 555 F. Supp. 870 (S.D.Miss. 1983), the Federal court held that the instruction was properly refused since robbery was proven and any murder committed during the robbery was capital murder. In Jones v. State, 381 So.2d 983 (Miss. 1980), no evidence was presented that the defendant, Jones, was the one who struck the lethal blows to the victim, although blood was found on his boots.
Jones v. State, supra, is similar to the case sub judice. There is no direct evidence that Cannaday stabbed Wojcik. However, she admitted to the kidnapping. Any murder committed during that kidnapping would have been capital murder imputed to all three of the perpetrators. To be a lesser included offense, kidnapping would have to be a component of murder. Instead the charge of kidnapping is an *725 underlying felony which elevates the murder charge to that of capital murder. Murder and manslaughter may be lesser included offenses of capital murder, but kidnapping is not. In Re Jordan, 390 So.2d 584 (Miss. 1980). We find no error in this assignment requiring reversal of the guilt phase.

III.
All other assignments need not be addressed since a new sentence trial will be held, with the exception of assignment 7, that the imposition of the death penalty on a sixteen year old child at the time of the crime constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments.
Cannaday raises her age (sixteen at the time of the crime) as an issue on appeal asserting that the imposition of the death penalty on a sixteen year old would be cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution.
The United States Supreme Court granted certiorari on this issue. See Eddings v. Oklahoma, 450 U.S. 1040, 101 S.Ct. 1756, 68 L.Ed.2d 237 (1981). However, the high court reversed Eddings on an alternative ground and did not address the age issue. See Eddings v. Oklahoma, 455 U.S. 104, 122, 102 S.Ct. 869, 886, 71 L.Ed.2d 1, 14 (1982).
In light of the Supreme Court's silence on this issue, the problem of when a juvenile can be punished the same as an adult remains with the Legislature. The law in Mississippi specifically Mississippi Code Annotated section 43-21-151 (1972) provides that: "No child who has not reached his thirteenth birthday shall be held criminally responsible or criminally prosecuted for a misdemeanor or a felony... ." Inferentially one who has reached his or her thirteenth birthday, may in certain cases be tried as an adult. Mississippi Code Annotated section 43-21-137 (1972). This necessarily implies that the juvenile in these cases could be punished the same as an adult.
The capital murder statutes in this state include as age a mitigating factor to be considered. Mississippi Code Annotated section 99-19-101(6)(g) (1972) (1983 Supp.). See also, Tokman v. State, 435 So.2d 664 (Miss. 1983). In the case sub judice age was considered along with other mitigating circumstances supported by the evidence. With this in mind, the jury returned the sentence of death. Even though we grant Cannaday a new trial on the sentence phase, her age at the time of the crime remains a mitigating factor to be considered by the jury. Her age by itself is not grounds for reversal.

HEARING ON PETITION FOR WRIT OF ERROR CORAM NOBIS
Cannaday relies on Dunn v. Reed, 309 So.2d 516 (Miss. 1975), for the proposition that the Harrison County Circuit Court had jurisdiction to hear testimony and consider new evidence via petition for writ of error coram nobis after appeal had previously been perfected to this Court.
In Dunn v. Reed, supra, Chief Justice Gillespie interpreted Mississippi Code Annotated section 99-35-145(2) which provides:
(2) In all cases wherein a judgment of conviction in a criminal prosecution has been affirmed on appeal by the supreme court, no petition for the writ of error coram nobis shall be allowed to be filed or entertained in the trial court unless and until the petition for the writ shall have first been presented to a quorum of the justices of the supreme court, convened for said purpose either in term time or in vacation, and an order granted allowing the filing of such petition in the trial court.
The Dunn case involved guilty pleas to manslaughter and arson. These pleas were entered in the Neshoba County Circuit Court. Subsequently, a petition for writ of error coram nobis was filed in that same court. The petition was dismissed without an evidentiary hearing on the grounds that it was not brought in the *726 proper court. This Court acknowledged that if the allegations in the petition were true, the issuance of the writ would be required.
Speaking for the majority, Justice Gillespie held that Mississippi Code Annotated section 99-35-145(2) did not apply where convictions had not been affirmed on appeal. This Court held that "The Neshoba County Circuit Court had exclusive jurisdiction to entertain the petition for a writ, and it was error to dismiss the petition without an evidentiary hearing." (Id. at 518).
Dunn is distinguishable from the case sub judice. Dunn involved guilty pleas, whereas Cannaday was convicted after a plea of not guilty. There would never have been a direct appeal to this Court in Dunn because of the guilty pleas. On this basis Dunn v. Reed is not applicable to the case sub judice.
This Court has held that before a petition for error coram nobis will lie, it is necessary that this Court consider the case on the merits. Johnson v. State, 416 So.2d 679 (Miss. 1982); Murphree v. State, 222 So.2d 694 (Miss. 1969). See also Harvey v. State, 251 Miss. 36, 168 So.2d 49 (1964); Petition of Lee Broom, 251 Miss. 25, 168 So.2d 44 (1964).
In Depreo v. State, 407 So.2d 102 (Miss. 1981) a bill of exceptions was filed in the circuit court after appeal had been perfected. Addressing the jurisdictional issue there this Court held:
It is obvious that the filing of the instrument on June 26, 1979, was after the appeal had been perfected to this Court and therefore the lower court was entirely correct in holding that it had no jurisdiction to hear the instrument filed. Denton v. Maples, 394 So.2d 895 (Miss. 1981); Edmonds v. Delta Democrat Publishing Co., 221 Miss. 785, 75 So.2d 73 (1954).
It is therefore apparent that the third and final assignment of error is without merit. In the event appellant has merit in the allegations in his instrument filed, after the appeal was perfected, he has adequate recourse to present those contentions at the proper time and place. (Id. at 109).
We hold that the trial judge was correct when he decided that Cannaday had lost her jurisdiction in the circuit court when appeal was perfected to this Court. It was not error to deny coram nobis relief.
GUILT PHASE, Affirmed.
All Justices concur.
SENTENCE PHASE, Reversed and Remanded For A New Trial.
PATTERSON, C.J., ROY NOBLE LEE, P.J., BOWLING, HAWKINS, DAN M. LEE, ROBERTSON and SULLIVAN, JJ., concur.
WALKER, P.J., dissents.
WALKER, Presiding Justice, dissenting:
The majority has reversed the death sentence in this case because Attina Marie Cannaday did not have an attorney present when she remarked to a guard (in response to a question) "after the head was cut back, I took the head and shook it and tried to break it off."
I do not believe that a defendant who has been appointed an attorney or who has employed an attorney and presumably been advised of her constitutional rights under the Fifth[1] and Sixth[2] Amendments to the *727 United States Constitution not to make any statements to authorities without her attorney present, is entitled to any further protection in this regard.
The Sixth Amendment does not require twenty-four hour a day presence of counsel. Nor do I believe that the Sixth Amendment prevents authorities from asking a question of a defendant so long as the defendant is willing to answer and does not then invoke the right not to answer except with her attorney present. I feel confident that the framers of the Constitution never intended that it would protect a defendant from her arrogant utterings, voluntarily made, with respect to the details of a crime committed by her.
In this case Cannaday was not coerced in any way nor promised any reward when she answered a casual question by the jail guard and admitted her participation in this heinous crime. It was not only a confession of her guilt but was evidence of her lack of remorse, callous feelings and depraved heart with respect to the crime which she planned and enticed others into helping her commit.
I would affirm the finding of the jury and the judgment of the circuit court.
NOTES
[1] Gray was granted immunity from prosecution on the rape charge in exchange for his testimony concerning the rape.
[2] See Warden v. Stumes, ___ U.S. ___, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984).
[1] "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any Criminal Case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. CONST. amend V.
[2] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. CONST. amend VI.