BARNES, J„
for the Court:
¶ 1. A Monroe County Circuit Court jury convicted nineteen-year-old John Daniel Rodgers of burglary of a dwelling, conspiracy to commit larceny, and armed robbery. He was acquitted of two other charges. For the burglary-of-a-dwelling conviction, Rodgers was sentenced to twenty-five years in the custody of the Mississippi Department of Corrections (MDOC), with ten years suspended and five years of post-release supervision. He was sentenced to five years in the custody of the MDOC for the conspiracy conviction, with all five years suspended. For armed robbery, Rodgers was sentenced to thirty years in the custody of the MDOC, with fifteen years suspended and five years of post-release supervision. All sentences were ordered to run concurrently. Rodgers appeals, claiming that the circuit court erred in excluding certain expert testimony. Finding no error, we affirm.
SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. Three of Rodgers’s school acquaintances — Jerrorie Gates, Tyrone Gilleylen, and Eric Dobbs — devised a plan to burglarize the home of Doyle and Virginia Harris. Gilleylen called Rodgers, asking him for a ride, and Rodgers agreed. Just after midnight on October 20, 2008, Rodgers drove his friends to the Harris home; Gates, Gilleylen, and Dobbs proceeded to burglarize the home and beat the couple severely. Rodgers stayed in the car and never entered the home.
¶ 3. All four men were indicted on five counts: burglary of a dwelling, conspiracy to commit larceny, two counts of aggravated assault, and armed robbery. Gates, Gilleylen, and Dobbs pleaded guilty to the charges against them, and each was sentenced to twenty-five years in the custody *991 of the MDOC. Rodgers, however, did not accept a plea bargain.
¶4. Prior to Rodgers’s jury trial, defense counsel moved for a continuance, claiming that there might be an issue of competency to stand trial, as Rodgers had suffered a brain injury at birth. At the motion hearing on October 30, 2009, Rodgers’s mother testified that Rodgers was a “blue” baby, meaning that, when he was born, the umbilical .cord was wrapped around his neck. Rodgers’s father testified that Rodgers “struggled” in school, that he had to attend special education classes, and that he was susceptible to being “misled.” Rodgers’s mother corroborated this testimony, although she noted that Rodgers was not currently receiving any medical treatment. Dr. Louis Masur, a clinical psychologist who had briefly interviewed Rodgers, also testified. Dr. Masur submitted that Rodgers had “As-perger’s Disorder,” a mild form of autism, and that this condition resulted in Rodgers having inadequate social skills and maturity for his age. He also testified that Rodgers’s mental age was “around 11 years.” Dr. Masur admitted that due to his limited examination of Rodgers, he was unable to say whether Rodgers was competent to stand trial. Thus, the purpose for the continuance was to allow time for Dr. Masur to examine Rodgers’s medical records and conduct more thorough psychological testing. The circuit court judge granted Rodgers’s motion for continuance and ordered a competency hearing. At the February 22, 2010 competency hearing, additional testimony was presented by Dr. Masur and the State’s psychologist, Dr. Criss Lott, and the circuit court found Rodgers competent to stand trial.
¶ 5. At Rodgers’s jury trial, the defense claimed that Rodgers’s cognitive issues made it difficult for him to understand that the others were planning to burglarize the home; therefore, he could not be guilty of the crimes charged. However, Gates, Gil-leylen, and Dobbs all testified that Rodgers had knowledge of the plan to commit the burglary beforehand.
¶ 6. On February 26, 2010, Rodgers was convicted on three of the five counts charged.[1] For Count I, burglary of a dwelling, Rodgers was sentenced to twenty-five years in the custody of the MDOC, with ten years suspended and five years of post-release supervision. For Count II, conspiracy to commit larceny, he was sentenced to five years in the custody of the MDOC, with all five years suspended. For Count III, armed robbery, Rodgers was sentenced to thirty years in the custody of the MDOC, with fifteen years suspended and five years of post-release supervision. All sentences were ordered to run concurrently.
¶ 7. Rodgers filed a motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The circuit court denied his motion. Rodgers now appeals, contending the circuit court erred in excluding expert testimony by Dr. Mas-ur regarding Rodgers’s ability to understand the circumstances surrounding the burglary. Finding no error, we affirm.
DISCUSSION AND ANALYSIS
¶ 8. During the trial, the State filed a motion to exclude testimony by the defendant’s expert witness, Dr. Masur, claiming his testimony would refer to Rodgers’s “diminished capacity,” which generally is not recognized in Mississippi as a defense to a criminal charge. See Brown v. State, 981 So.2d 1007, 1015 (¶ 24) (Miss.Ct.App.2007). The State argued:
*992 [A]nything that Dr. Masur would say from the stand would come from his professional psychological relationship with the Defendant in which his opinions have been drawn, on which his opinions are based, and the information he used as that expert. And you can’t remove that from him and allow him to testify as to [Rodgers’s] interviewing skills or his mannerisms. Those things from Dr. Masur inherently go to the Defendant’s capacity.
The defense countered that Dr. Masur’s testimony would only address how Rodgers behaved in interviews. Defense counsel claimed that the testimony was relevant to “back up” and “explain” evidence from Rodgers’s statement to the police that he was a special education student and had “dyslexia.” The circuit court observed that it might be “difficult for [Dr. Masur] to testify within those prescribed bounds” and noted that the defense had listed several -witnesses to testify, stating:
It would seem — and the Court doesn’t know what the 12 proposed defense witnesses are going to testify, but it would seem to the Court that there’s a possibility the Defendant could present through one or more or several of these witnesses what you would propose to present with Dr. Masur.
[[Image here]]
I believe, though, that the other witnesses on your witness list are going to be able to testify to the same thing is what it appears to me.
Defense counsel attempted to proffer the testimony, stating: “But it goes into personality of this young boy, his personality, how he is around people in interviews.... It’s hard to explain exactly what it is, but it’s his characteristics that he is an agreeable type people. He wants to please people.” The circuit judge rejected the proffer, concluding: “[P]art of my responsibility is to do what the appellate courts of this state tell us to do, and I am apprehensive about treading over into an area where we should not tread.” Thus, the circuit judge granted the State’s motion to exclude the testimony, yet expressed willingness “to revisit the issue” if the defense felt it was unable to get the information into the record through other witnesses. The defense, however, did not ask the circuit court to revisit the issue of testimony after its other witnesses had testified. Instead, it merely requested, regarding “the offer of proof,” that the circuit court “take judicial notice of [Dr. Masur’s] testimony previously and the report that was entered.”
¶ 9. In his post-trial motion, Rodgers argued:
The Court erred in not allowing Louis Masur to testify regarding his opinion on Defendant’s psychological disorders, their effect on Defendant’s ability to comprehend the circumstances surrounding his alleged involvement in the crime charged and how Defendant’s psychological conditions would affect his ability to participate in the police investigation (statement) placed in evidence in this case.
(Emphasis added). On appeal to this Court, Rodgers contends that the circuit court erred in excluding Dr. Masur’s testimony regarding his “inability to know about the crimes” and claims that the testimony was being “offered to show that [he] could not appreciate the co-defendants’ criminal scheme, not to show his lack of capacity to form criminal intent.”[2] *993 As such, Rodgers claims that the circuit court erred by excluding it.
¶ 10. A circuit court’s admission or exclusion of expert testimony is reviewed for abuse of discretion. Patterson v. Tibbs, 60 So.3d 742, 748 (¶ 19) (Miss.2011) (citing Utz v. Running & Rolling Trucking, Inc., 32 So.3d 450, 457 (¶ 8) (Miss.2010)). The decision to exclude expert testimony will only be considered error “if the decision was arbitrary or clearly erroneous.” Id. (citing Franklin Corp. v. Tedford, 18 So.3d 215, 237 (¶44) (Miss.2009)).
¶ 11. Rodgers never raised a defense of insanity and was found competent to stand trial. As the State aptly noted at trial: “If the defense claims insanity, such testimony is likely admissible. However, that is not the case here.”[3] Nevertheless, the United States Supreme Court has recognized the “ ‘interlocking and overlapping’ ” nature of the concepts of “actus reus, mens rea, insanity, mistake, justification, and duress” and has rejected the argument “that mens rea and insanity ... are entirely distinguishable, so that mental-disease and capacity evidence relevant to insanity is simply irrelevant to mens rea.” Clark v. Arizona, 548 U.S. 735, 768 n. 38, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006) (quoting Powell v. Texas, 392 U.S. 514, 535-36, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (plurality opinion)). The Court noted that “evidence of behavior close to the time of the act charged may indicate both the actual state of mind at that time and also an enduring incapacity to form the criminal state of mind necessary to the offense charged.” Id.
¶ 12. In Mississippi, the test set forth in M’Naghten’s Case, 10 Clark & F. 200, 210, 8 Eng. Rep. 718, 722 (1843), is applied by our courts in determining the sanity of a defendant. Russell v. State, 729 So.2d 781, 784 (Miss.1997) (citations omitted). For a defendant to be found insane, he must not have had “the ability ... to realize and appreciate the nature and quality of his deeds when committed and the ability to distinguish between right and wrong.” Id. A defendant’s sanity is the province of the jury, who may accept or reject both lay and expert testimony in making its determination. Id. However, in cases where insanity is not a defense, the Mississippi Supreme Court has “rejected the argument that expert testimony on the defendant’s state of mind and ability to react to external events would aid the jury in its function as finder of facts[.]” Garrison v. State, 726 So.2d 1144, 1151 (¶ 18) (Miss.1998) (citing Taylor v. State, 452 So.2d 441, 449 (Miss.1984)) (emphasis added). “To permit comment on the subjective intentions of an accused by a witness based on conclusions reached from his observation invades the province of the fact finders.” Id. at 1150 (quoting Newell v. State, 308 So.2d 71, 73 (Miss.1975)).
¶ 13. As previously noted, “ ‘diminished capacity’ is not a recognized defense to a criminal charge in Mississippi.” Brown, 981 So.2d at 1015 (¶ 24).[4] Mississippi has *994 barred evidence of diminished capacity not only when it encompasses the impairment of a defendant’s mental reasoning by reason of “voluntary intoxication,” Sanders v. State, 63 So.3d 554, 570 (¶ 52) (Miss.Ct.App.2010) (citation omitted), but also when it involves evidence of “extreme mental or emotional disturbance,” Garcia v. State, 828 So.2d 1279, 1284 (1112) (Miss.Ct.App.2002), or “diminished perception and capacity due to [a] heightened state of arousal and fear[.]” Livingston v. State, 943 So.2d 66, 71 (¶ 12) (Miss.Ct.App.2006).
¶ 14. Rodgers submits that Dr. Masur’s testimony was not evidence of “diminished capacity.” Rather, he claims that the testimony, which concerned Rodgers’s personality and how he reacts to others, was merely “observational” evidence. He contends this evidence was admissible to rebut the State’s proof concerning mens rea. Rodgers cites Clark, to support his argument.[5] Clark analyzed three “categories of evidence with a potential bearing on mens rea.” Clark, 548 U.S. at 757, 126 S.Ct. 2709. First is “observation evidence,” which includes testimony from those who observed the defendant’s actions and what he heard. This category of evidence “also includefs] testimony that an expert witness might give about [a defendant’s] tendency to think in a certain way and his behavioral characteristics.” Id. “Second, there is ‘mental-disease evidence’ in the form of opinion testimony that [a defendant] suffered from a mental disease with features described by the witness.” Id. at 758. Lastly, there is “capacity evidence,” which is also “opinion evidence” and addresses “a defendant’s capacity for cognition and moral judgment (and ultimately also his capacity to form mens rea).” Id. The Clark Court concluded that a state may constitutionally channel “evidence on mental-disease and capacity” to an insanity defense. Id. at 778-79.
¶ 15. As Clark noted, an expert’s observation evidence may include a defendant’s “tendency to think in a certain way and his behavioral characteristics.” Clark addressed the Arizona Supreme Court’s holding in State v. Mott, 187 Ariz. 536, 931 P.2d 1046, 1054 (1997), which distinguished admissible observation evidence from inadmissible evidence addressing a defendant’s diminished capacity. In Mott, the defendant alleged error in the exclusion of expert testimony concerning the “defendant’s history of being battered and of her limited intellectual ability[.]” Id. at 1050. The Mott court noted that such testimony “was not offered as a defense to excuse her crimes but rather as evidence to negate the mens rea element of the crime.” Id. Mott distinguished this type of evidence from that offered in State v. Christensen, 129 Ariz. 32, 628 P.2d 580, 582 (1981), where a psychologist’s testimony-that defendant reacts impulsively in stressful situations — was admissible to challenge the element of premeditation. Mott observed that the evidence in Christensen “was not that he was incapable, by reason of a mental defect, of premeditating or deliberating but that, because he had a tendency to act impulsively, he did not premeditate the homicide.” Mott, 931 P.2d at 1054. “Because he was not offering evidence of his diminished capacity, but only of a char *995 acter trait relating to his lack of premeditation, the defendant was not precluded from presenting the expert testimony.” Id. However, in Mott, the defendant was attempting to offer testimony that her “fear, low intelligence, and psychological trauma resulting from abuse affected the defendant’s capacity to make the decision to take her [injured] child to the hospital.” Id. Therefore, the Mott court held that the evidence offered by the defendant addressed “diminished capacity” and that it was not error for the trial court to exclude it. Id. at 1055.
¶ 16. We agree with the State’s continued assertion that Dr. Masur’s proposed testimony concerned “diminished capacity.” We find little distinction between testimony that a defendant is not capable of forming mens rea and the testimony offered in this case — that Rodgers’s behavioral characteristics or tendencies could render him unable to readily comprehend that he was participating in a crime. In Cannaday v. State, 455 So.2d 713, 720 (Miss.1984), the Mississippi Supreme Court upheld a trial court’s exclusion of testimony by two mental-health experts regarding whether the defendant, who was found have “limited mental ability,” was capable of plotting a murder and understanding the “severity” of the situation. The supreme court observed that such testimony was an attempt “to assert a diminished capacity defense[.]” Id. At Rodgers’s trial, the defense attempted to proffer Dr. Masur’s testimony regarding Rodgers’s “personality”; in other words, the fact that he is “agreeable” and his desire to “please people.” Also, in his report submitted at the competency hearing, Dr. Masur noted his concern that Rodgers “might be easily exploited.” Dr. Masur concluded in the report: “Even if he were told what would be happening, his attention deficit, social immaturity and lack of judgment associated with the As-perger’s Disorder and likely delay in the ability to process social stimuli likely would have significantly impaired his ability to appreciate the wrongfulness of the alleged acts.” (Emphasis added). In his post-trial motion, Rodgers clearly stated that this testimony was Dr. Masur’s “opinion on Defendant’s psychological disorders, their effect on Defendant’s ability to comprehend the circumstances surrounding his alleged involvement in the crime charged.” (Emphasis added). As Clark observed:
There are, finally, particular risks inherent in the opinions of the experts who supplement the mental-disease classifications with opinions on incapacity: on whether the mental disease rendered a particular defendant incapable of the cognition necessary for moral judgment or mens rea or otherwise incapable of understanding the wrongfulness of the conduct charged. Unlike observational evidence bearing on mens rea, capacity evidence consists of judgment, and judgment fraught with multiple perils: a defendant’s state of mind at the crucial moment can be elusive no matter how conscientious the enquiry, and the law’s categories that set the terms of the capacity judgment are not the categories of psychology that govern the expert’s professional thinking. Although such capacity judgments may be given in the utmost good faith, their potentially tenuous character is indicated by the candor of the defense expert in this very case.
Clark, 548 U.S. at 776-77, 126 S.Ct. 2709 (emphasis added). It is apparent that Dr. Masur’s testimony was offered, not merely as observation evidence, but as opinion evidence as to whether Rodgers’s mental deficiencies made it unlikely that he was capable of knowing what he was doing. While we recognize that a small portion of the testimony proffered by Dr. Masur may *996 have been admissible observation evidence, we agree with the circuit judge that it would have been difficult for Dr. Masur to testify within these “prescribed bounds,” especially when we consider Rodgers’s post-trial arguments. Accordingly, we agree with the circuit court that Dr. Mas-ur’s proposed testimony constituted inad-missable “diminished capacity” evidence.
¶ 17. Furthermore, as to true observation evidence, Rodgers’s impaired social skills and difficulties in processing social cues were adequately provided through lay testimony. The testimony from lay witnesses sufficiently showed Rodgers’s questionable ability to perceive a possibly dangerous situation and his tendency to be too agreeable and easily misled. Rodgers’s former special education teacher, Tanya McCord, stated that he had “inadequacies” in his social skills, and she testified that children like Rodgers “could be easily led into something when they don’t even know what it’s all about, and they can be easily deceived.” Samuel Ball, a friend of Rodgers, testified: “He’s kind of slow when it comes to conversations. Sometimes he don’t comprehend at all.” Samuel’s mother, Melinda Ball, corroborated this testimony, stating that Rodgers was “slow” and that it was often necessary to repeat things to him in order that he might comprehend them. Further, Rodgers’s decision not to ask the circuit judge to revisit his ruling regarding Dr. Masur’s testimony at the close of the defense’s case-in-chief may have led the judge to believe that the defense felt it adequately presented this evidence through its lay witnesses’ testimony.
¶ 18. We conclude that the circuit court’s exclusion of Dr. Masur’s testimony was not arbitrary or clearly erroneous, and we affirm the circuit court’s judgment.
¶ 19. THE JUDGMENT OF THE MONROE COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, BURGLARY OF A DWELLING, AND SENTENCE OF TWENTY-FIVE YEARS WITH TEN YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION; COUNT II, CONSPIRACY TO COMMIT LARCENY, AND SENTENCE OF FIVE YEARS WITH FIVE YEARS SUSPENDED; AND COUNT III, ARMED ROBBERY, AND SENTENCE OF THIRTY YEARS, WITH FIFTEEN YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION, AND TO PAY A TOTAL FINE OF $3,000, WITH THE SENTENCES ON ALL COUNTS TO RUN CONCURRENTLY, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON MAXWELL AND FAIR, JJ. CONCUR. RUSSELL, J„ CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.

. Rodgers was acquitted of the two aggravated assault charges.

. For example, did Rodgers have the awareness to perceive that his co-defendants’ actions — asking him for a ride at midnight while wearing dark clothing — might be indicative of a criminal purpose? Did he appreciate the circumstances when Gilleylen donned a ski *993 mask, and Gates, a stocking cap? When they asked him to drive down a dead-end road, turn around, and wait in the car while they got out?

. See Russell v. State, 729 So.2d 781, 785 (Miss.1997) (when insanity is tendered as a defense, both expert and lay testimony are admissible, but a lay witness may not project an opinion of insanity as to some date subsequent to his observation of the defendant.)

. The United States Supreme Court in Clark, acknowledged that "diminished capacity” has been given various meanings and noted that traditionally it has been understood to be a " 'showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication[.]’ ” Clark, 548 U.S. at *994 773 n. 41, 126 S.Ct. 2709 (citing People v. Berry, 18 Cal.3d 509, 134 Cal.Rptr. 415, 556 P.2d 777, 781 (1976)).

. In Clark, the defendant, a paranoid schizophrenic, was initially declared incompetent to stand trial and committed for two years. Later, his competency was restored, and he was tried for murder. One issue addressed by the U.S. Supreme Court was whether the exclusion of evidence of mental illness or incapacity due to mental illness, as it related to the defendant’s mens rea, violated his due-process rights.