# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00294-COA

**OCTAVIOUS MORRISON A/K/A MORRISON OCTAVIOUS A/K/A BAM**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

DATE OF JUDGMENT:                02/27/2020
TRIAL JUDGE:                HON. WINSTON L. KIDD
COURT FROM WHICH APPEALED:                HINDS COUNTY CIRCUIT COURT,
                FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:                OFFICE OF STATE PUBLIC DEFENDER
                BY: W. DANIEL HINCHCLIFF
ATTORNEY FOR APPELLEE:                OFFICE OF THE ATTORNEY GENERAL
                BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:                JODY EDWARD OWENS II
NATURE OF THE CASE:                CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 01/18/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## BEFORE CARLTON, P.J., LAWRENCE, McCARTY AND EMFINGER, JJ.

### McCARTY, J., FOR THE COURT:

¶1. A young man shot his teenage girlfriend with a shotgun, killing her and her unborn child. He was charged with two counts of capital murder. A jury convicted him of one count of culpable-negligence manslaughter. He now appeals, raising five assignments of error.

## FACTS AND PROCEDURAL HISTORY

¶2. Seventeen-year-old Octavia Love was weeks away from giving birth to her first child. One Saturday morning, she went to visit her nineteen-year-old boyfriend, Octavious Morrison, who lived a couple of houses down. Later that day, Octavia was found dead on

the floor of Morrison's bedroom, having suffered a shotgun wound to the back of her head. Morrison was the only person there when Octavia died. In the hours following the shooting, he gave different several different accounts of what happened.

¶3.     Morrison initially told members of Octavia's family that she "shot herself." According to Montgomery Tyler, Octavia's de facto stepfather, Morrison "flagged [him] down" in his driveway and said "something wrong with your daughter." Morrison told him, "She ain't breathing and something like that and I believe she had shot herself." At that point, Tyler ran inside to tell Octavia's brothers, and the family rushed to Morrison's house to find out what happened.

¶4.     Octavia's younger brother Curtis got there first and saw his "sister on the floor in her own blood." As he would later testify, "She was just still, just laying there. I couldn't tell her to get up because I already knew she was gone. It was too late." Curtis observed Morrison "up in the living [room] just standing there ain't saying a word."

¶5.     Octavia's older brother Marquis and a family friend arrived shortly after Curtis. According to Marquis, "at first [Morrison] didn't want to let me in the house." But Marquis said Morrison "wasn't going to stop [him] from seeing [his] sister" and made his way inside. Morrison "didn't tell [them] where she was," so they "had to go to room to room looking for her." They searched until they found Octavia lying dead on the floor of Morrison's bedroom. Stunned, Marquis "called her name" to try to wake her up. He remembered noticing his brother Curtis was so frightened he "couldn't move." When Marquis asked Morrison what happened, he again said that "she shot herself."

¶6.    After a call to 911, Patrolman Elijah McDonald arrived first.  He saw Octavia lying on her back on the floor with a .410 rifle across her body.  He noticed a "small" amount of blood where her body was found, "streaks going across the floor," and a large pool of blood between the bed and the couch.  According to the officer, Morrison told him Octavia had shot herself.  He described Morrison's demeanor as "calm and casual" as law enforcement and other personnel examined the scene.  Although he had not yet been charged with a crime, police took Morrison to the station for an interview that evening.

¶7.    While riding to the interview in the back of the police car, Morrison struck up a conversation with Officer McDonald.  According to the officer, Morrison said, "I'm going to tell you what really happened, but first let me ask you a question, can you get the same time for an accidental shooting as you would for a murder?"  Officer McDonald told him he was "not sure."  Morrison then told a story much different than the one he had initially told.  He explained that he had left the shotgun on a couch in the bedroom.  After taking a shower, he walked out of the bathroom and saw that "Octavia was playing with the gun."  Morrison "then got up on the bed, grabbed the gun from her, and while doing so accidentally shot her in the head."  He claimed he "attempted to revive her."

¶8.    At the police station, Officer Nashotta Luckett read Morrison his rights, and the suspect signed a *Miranda* waiver.  As soon as the interview began, Morrison asked the detective, "Is accidental homicide and homicide the same thing?"

¶9.    Throughout the hour-long interview, Morrison's story changed shape.  First, he told detectives—as he had told Officer McDonald—that the gun accidentally discharged as he

3

tried to take it from Octavia. He recalled that he and Octavia were talking while in bed. Morrison got up to take a shower and then "got back in the bed . . . with Octavia." She "grabbed [his] gun" off the couch and was "playing with it" and "waving it." Morrison told detectives he knew the gun was loaded but did not know the hammer was pulled back. Morrison took the gun from her, and at that point, "the gun went off . . . accidental" and "struck her in the head." He said the gun "went boom," and "she just laid there." He shook her to see "if she was alive." "Panicked" and "in shock," Morrison ran to the front room to call "some of his family members" to tell them what happened and then called 911. Morrison's father came to the house briefly. According to Morrison, his father saw the body, exclaimed "For real?" and left. Morrison then went to find Octavia's stepfather.

¶10. Later in the interview, Officer Luckett asked Morrison why he laid the shotgun across Octavia's body. At first he said, "Oh, I wasn't even trying to." Then the officer asked if he was "trying to make it look like she shot herself." Morrison was silent for several seconds and then said, "I had just laid the gun on her. I was still in shock." Officer Luckett repeated the question. After another pause, Morrison said, "I ain't trying to go to jail." When asked a third time whether he tried to make it look like she shot herself because he "was scared," Morrison replied, "Yes mam . . . I ain't gonna go to jail for life."

¶11. Officer Luckett informed Morrison that "when Octavia died, the baby died, so that's two murders." Morrison responded, "[I]t was accidental though," and Morrison asked if he would "still get charged with 25 and 25," meaning two twenty-five-year prison sentences. He wanted to know if he would be "doing life."

4

¶12. The detectives continued to press Morrison for details about the incident. About halfway through the interview, Morrison changed his story again to give a third, completely different version of events. In this new narrative, Octavia was playing with the gun, but after Morrison took it from her, he had it in his possession for "like a minute." He admitted that he, too, was "playing with it" and "waving it." Morrison recalled that Octavia was "turned over a little bit" when he "made a mistake and flipped the trigger." In this final version of the story, Morrison said he did not know the gun was loaded.

¶13. Following the interview, Morrison was charged with two counts of capital murder for the deaths of Octavia and her unborn child. The trial was delayed for more than six years due in part to mental evaluations and competency hearings. Morrison was eventually deemed competent, and the case proceeded to trial.

¶14. The State began its case-in-chief with testimony from Octavia's mother, Catrina Love. Catrina described the day of her daughter's death as "[t]he worst day of [her] life." She recalled that she and the entire family had been excited for the upcoming birth of Octavia's child. The State questioned Catrina about the identity of the baby's father, and Catrina said it was Octavia's ex-boyfriend Calvin Miller. The jury also heard testimony from other members of Octavia's family, including Montgomery Tyler and Curtis and Marquis Love.

¶15. The State called Officer McDonald, as well as Officer Nashotta Luckett, who had interviewed Morrison and investigated the case. During Officer Luckett's testimony, the State played an audiotape of Morrison's police interview. The jury also heard from firearms expert Starks Hathcock and the state medical examiner Dr. Mark LeVaughn. During the

pathologist's testimony, graphic photos were admitted over the defense's objection.

¶16. Morrison provided notice of an insanity defense, and the court gave jury instructions on the theory. The defense presented testimony from Jacob Burchfield, a trace evidence expert from the Mississippi Forensics Lab; Terraino Echoals, Morrison's childhood friend; Michael Dory, who lived with Morrison at the time of the shooting; and Annie Dory, the woman who raised Morrison for much of his life.

¶17. The jury ultimately convicted Morrison of one count of culpable-negligence manslaughter for the death of Octavia.

## DISCUSSION

### I. The *Weathersby* rule does not apply.

¶18. The trial court denied Morrison's motion for a directed verdict and his request for a jury instruction based on *Weathersby*. On appeal, Morrison argues he was entitled to both.

¶19. Nearly a century ago, our Supreme Court held that "where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge." *Weathersby v. State*, 165 Miss. 207, 147 So. 481, 482 (1933). Accordingly, "[w]here the *Weathersby* rule applies and the defendant's version affords an absolute legal defense, the defendant is entitled to a directed verdict of acquittal." *Green v. State*, 631 So. 2d 167, 174 (Miss. 1994).

¶20. However, there are limitations on the application of *Weathersby*. *Id*. For instance,

6

the rule will not apply "where the defendant's conduct and statements following the killing are inconsistent with his version of the events as recounted at trial." *Id.*

¶21.    Several years ago, our Court examined this limitation in a case bearing a striking resemblance to Morrison's. *Parvin v. State*, 212 So. 3d 863, 871 (¶18) (Miss. Ct. App. 2016). In *Parvin*, a man was convicted of deliberate design murder for the death of his wife. On the morning of her death, the man called 911 to "report that he accidentally had shot . . . his wife of forty-nine years[.]" *Id.* at 867 (¶3). He claimed he "had been rushing out of the house to shoot a beaver and was carrying a loaded shotgun," and "in his haste, he tripped, and . . . the gun discharged[.]" *Id.* Given that he was the only witness to the shooting, Parvin argued he should be acquitted under the *Weathersby* rule. *Id.* at 870 (¶17). However, at trial Parvin's mistress "testified that Parvin initially told her that [his wife] had committed suicide." *Id.* at 871 (¶18). Then "[s]ometime later, he admitted that he had lied about the manner of his wife's death and told his paramour that the shooting had been an accident." *Id.*

¶22.    Ultimately, this Court found that Parvin could not invoke the *Weathersby* rule "due to his highly inconsistent statements following his wife's death." We explained that "[b]ecause Parvin's claim that his wife had taken her own life contradicted his assertion that he had shot her accidentally . . . Parvin [was] not entitled to a judgment of acquittal under *Weathersby*." *Id.*

¶23.    Here, just as the husband in *Parvin* "changed his story" of how his wife died, Morrison told three distinctly different stories about Octavia's death. *Id.* Morrison initially

7

told members of Octavia's family and Officer McDonald that she "shot herself." In a second version of the events, he recounted that in trying to grab the gun from Octavia, it "went off." Morrison then had a third version of events in which he took the gun from Octavia, was "playing with it" for "about a minute," and then accidentally shot her.

¶24. Given Morrison's highly inconsistent statements in the hours following Octavia's death, the *Weathersby* rule is inapplicable here. Therefore, we affirm the trial court's denial of Morrison's requests for a directed verdict and jury instruction based on *Weathersby*.

## II. The trial court did not abuse its discretion in admitting two graphic photographs.

¶25. Morrison argues that the trial court erred in admitting two "beyond inflammatory and gruesome" photos because their probative value was substantially outweighed by their graphic and gruesome nature.

¶26. "Admission of photographs by the trial court is reviewed for abuse of discretion." *Martin v. State*, 289 So. 3d 703, 705 (¶7) (Miss. 2019) (quoting *Chamberlin v. State*, 989 So. 2d 320, 340 (¶73) (Miss. 2008)). "A decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion." *Id*.

¶27. The Mississippi Rules of Evidence state: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." MRE 403. Notably, with regard to the admissibility of photographic evidence, our Supreme Court has held that "[s]ome probative value is the only requirement needed." *Martin*, 289 So. 3d at 705 (¶7). For "[e]ven if the

photograph is gruesome, grisly, unpleasant, or even inflammatory, it still may be admitted so long as it has probative value and its introduction serves a meaningful evidentiary purpose." *Mosley v. State*, 307 So. 3d 1261, 1268 (¶26) (Miss. Ct. App. 2020). We have described a "meaningful evidentiary purpose" as "one that describes the circumstances of the killing, its location, or the cause of death or supplements a witness's testimony." *Id*. at 1268-1269 (¶26).

¶28. In rare cases, Mississippi courts have ruled photographs inadmissible based on their gruesome and prejudicial nature. *Id*. at 1269 (¶27). Such was the ruling in the benchmark case of *McNeal v. State*, 551 So. 2d 151, 159 (Miss. 1989). There, the Supreme Court held that photos depicting "the full-color, close-up view of the [victim's] decomposed, maggot-infested skull" were "gruesome and lack[ed] any evidentiary purpose" and that therefore "the probative value of the photographs [was] outweighed by their tendency to inflame and prejudice the jury." *Id*.

¶29. It is primarily under this precedent that Morrison challenges the admissibility of two photographs—Exhibit S-20 and Exhibit S-19B. We address each in turn.

> *A.      It was not error to admit S-20.*

¶30. The first image complained of is an autopsy photo of Octavia's head. The photo shows a cross-section of Octavia's exposed skull, including where the bullet exited her brain. Morrison argues the "vivid and full color close up view of the dissected skull of Octavia" is "remarkably analogous" to the photos that were found to be prejudicial in *McNeal*. He therefore claims the trial court abused its discretion in admitting it.

9

¶31. The Supreme Court recently addressed a similar case involving autopsy photos of a victim's skull. *Martin*, 289 So. 3d at 705-06 (¶¶8-9). There, a man was convicted of second-degree murder for beating his mother's boyfriend, James Brown, to death. *Id*. at 704 (¶2).

¶32. The sole issue on appeal was "[w]hether the trial court abused its discretion in admitting autopsy photographs alleged by Martin to be gruesome, inflammatory, and more prejudicial than probative." *Id*. at 705 (¶6). The pathologist determined that the cause of death was blunt-force trauma and that "the most severe injuries suffered by Brown were massive fractures of all of his facial bones." *Id*. at (¶¶8-9). During the pathologist's testimony at trial, the State admitted two autopsy photos of the victim. *Id*. One of the photos "depicted Brown's lungs filled with blood" and supported the pathologist's testimony that "the facial fractures caused a massive hemorrhage in Brown's airways, leading to his aspirating, or drowning, in his blood." *Id*. The other photo showed "the extent of the trauma and hemorrhaging to Brown's head." *Id*. In seeking to admit the photos, "[t]he State argued that it anticipated Martin's testifying consistently with his previous statements that he only hit Brown a few times and that the pictures would refute that testimony." *Id*. at 706 (¶8).

¶33. In its analysis, the Court pointed to decades of precedent upholding "the admission of photographs depicting bloody injuries." *Id*. at (¶11); *see Alexander v. State*, 610 So. 2d 320, 338 (Miss. 1992) (holding that a photo depicting "the opened skull of [the victim] during the autopsy, an opening created during the autopsy and not during the assault," was admissible to show the cause of death). Given this precedent, the Court found that "the two pictures were relevant and of probative value to assist [the pathologist] in his explanation to

10

the jury of the nature and extent of the injuries suffered by Brown." *Id*.

¶34. In this trial, the autopsy photo of Octavia's skull was admitted during the pathologist's testimony to show the nature and extent of her injuries. The State initially opted not to present photos of Octavia's dissected skull. Rather, S-20 was only admitted on redirect to rebut an insinuation that arose during cross that Octavia's injuries were not "catastrophic." On redirect examination of Dr. LeVaughn, the State sought to admit six photos for this purpose. However, the trial court allowed them to only choose two photos, noting that given their graphic content, "all of them together . . . potentially . . . would be prejudicial." Ultimately, the State selected only one—Exhibit S-20—which was admitted over Morrison's objection.

¶35. The photo was used to support Dr. LeVaughn's testimony regarding the effects of the gunshot wound to Octavia's head. When presented with the photo, Dr. LeVaughn explained to the jury the basic procedure pathologists use to examine the head during an autopsy—specifically the process of pulling back the scalp to reveal injuries to the skull and brain. In reviewing the photo of Octavia's skull, he noted that "this is the photograph of the right side of the head or the exit area of that projectile, so the back of the scalp is reflected downward, and the front of the scalp is reflected toward the face." He explained it "shows a massive hole in the skull where the projectile came out, and there's fractures." Dr. LeVaughn concluded, "In my opinion that's a catastrophic injury or that's a massive injury and it killed her."

¶36. Just as the Supreme Court concluded in *Martin*, we find that the photo was relevant

11

and of probative value to show the nature and extent of the victim's injuries and to support the pathologist's testimony on that issue.

¶37.   Morrison claims this photo is "remarkably analogous" to the photos deemed prejudicial in *McNeal*, but the photos in that case contained gruesome elements not present in Octavia's autopsy photo.   Namely, the photos in *McNeal* depicted a "decomposed, maggot-infested skull" *prior* to discovery by authorities.   *McNeal*, 551 So. 2d at 159.   In contrast, the photo here is clinical in nature, as it shows the victim's skull *during* the autopsy examination.   Given this key distinction, we cannot find that the autopsy photo of the victim's head rises to the level of gruesomeness of the photos in *McNeal*.

¶38.   While certainly graphic, the autopsy photo was relevant to show the nature and extent of the victim's injuries.   Given our precedent, it was within the discretion of the trial court to admit the photo.

### B.      *While gruesome, it was not error to admit S-19B.*

¶39.   The second photo is portrayed by counsel for Morrison as "a disturbing and horrific parody of birth."   In the photo, Octavia's body is lying on the autopsy table.   The horizontal image shows her mid-section—from just above her knees to her chest—after a surgical cut has exposed her organs.   The fetus has been removed from the uterus but is still attached to the umbilical cord; the child's body is lying across Octavia's lap.

¶40.   Morrison argues this crosses the boundary set by in *McNeal*.   Further, he claims the photo was unnecessary because the "death of the infant had been proved, and was not disputed."

¶41.  As previously discussed, the Supreme Court ruled in *McNeal* that photos depicting "the full-color, close-up view of the [victim's] decomposed, maggot-infested skull" were "gruesome and lack[ed] *any* evidentiary purpose." *McNeal*, 551 So. 2d at 159 (emphasis added).  The Court found that "[a]lthough the state argues that these photographs are relevant in proving the corpus delicti, we believe that the probative value of the photographs is outweighed by their tendency to inflame and prejudice the jury." *Id*.

¶42.  Significantly, however, the Court added that in reaching that decision, it "d[id] not presume to conclude that *every* gruesome photograph admitted into evidence constitutes an abuse of discretion[.]" *Id*. (emphasis added).  The Court cautioned trial judges to "carefully consider all the facts and circumstances surrounding the admission of this particular type of evidence" before admitting such graphic photographs. *Id*.

¶43.  In turn, the Court established a two-part test, holding that "the trial court must consider: (1) whether the proof is absolute or in doubt as to identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury." *Id*.

¶44.  Here, the record shows the trial court conducted a careful examination of the facts and circumstances surrounding the admission of the photo.  Following defense counsel's objection to a group of autopsy photos that included S-19B, the trial court considered each one, first hearing the objections, then asking the State the evidentiary purpose of the image. The trial court directed the State to narrow down the photos and "only pick out the ones that you need to prove your case."

¶45. The State then presented two photos of the fetus attached to the umbilical cord, arguing they were necessary "because one shows the impact of the umbilical cord and the position of the child in the wo[mb]" and because they "show what the cause of death was with this baby." The trial court questioned whether both were necessary. The State continued, arguing that S-19B showed "[t]he baby was actually in perfect health until that moment" and was "the only picture to show that."

¶46. The trial court ultimately excluded one of the photos of the fetus as cumulative. *See* MRE 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence"). Regarding the remainder of the autopsy photos, including S-19B, the trial court ruled that "if they are prejudicial then the prejudice would not outweigh any probative value" and that "[s]ince these photographs do have probative value, the court will allow them in to evidence." Notably, at the end of the ruling regarding the photograph, the trial court concluded, "By the very nature of this case, certain photographs will be gruesome and that's why I've tried to limit them, and the court would find that the purpose of these photographs are not to inflame the jury, and Court has found that they are probative."

¶47. After this careful deliberation, the State questioned Dr. LeVaughn about Exhibit S-19B. Upon examining the photo, Dr. LeVaughn described it and explained the circumstances of the child's death to the jury. He noted "the striking part about this photograph is that the skin discoloration of the fetus is very cyanotic or purple which indicates diminished or very low oxygenation." The pathologist concluded, "In my opinion of dealing with this child the

14

cause of death would be acute hypoxia, and hypoxia means low oxygen and acute is rapid, so the death of the child would be acute hypoxia due to the gunshot wound to the mother." He estimated that the child died "within minutes" of Octavia's death. He determined the manner of death was homicide.

¶48. Our precedent holds that "[a] photograph has probative value if it supplements or clarifies a witness's testimony or describes a cause of death." *Moberg v. State*, 303 So. 3d 815, 823 (¶25) (Miss. Ct. App. 2020). Accordingly, Exhibit S-19B had probative value because it supported Dr. LeVaughn's testimony regarding the cause and circumstances of the death of Octavia's unborn child. Given the evidentiary value of the photo, as well as the trial court's diligent inquiry into the matter and its limitation on the number of photographs, we cannot say it was an abuse of discretion to admit the photo.

¶49. Morrison also argues the photo was unnecessary because the death of the child was not disputed. But the Supreme Court has held, "Even where the issue for which the photograph is introduced is ultimately stipulated to, as a general rule, the fact that a photograph of the deceased in a homicide case might arouse the emotions of jurors does not of itself render it incompetent in evidence so long as introduction of the photograph serves some legitimate, evidentiary purpose." *Miller v. State*, 740 So. 2d 858, 864-65 (¶24) (Miss. 1999) (cleaned up). As previously explained, the photo of the deceased infant served a legitimate evidentiary purpose.[1]

---

[1] While we find no error in this case, in the future, an objection to the nature of a photo of this kind could have been addressed by simple redaction. Given the ease of photography and photo editing with modern technology, if this photo had been either zoomed in to portray only the deceased child or the borders of the existing photo redacted,

¶50. Despite the graphic nature of the photo, it was relevant to show the cause of death of the unborn child and to support the pathologist's testimony on that issue. For this reason, we cannot find that the trial court abused its discretion in admitting the photo. Furthermore, we can be confident it did not prejudice Morrison because the jury did not find him guilty for the death of the child.

### III. The trial court did not abuse its discretion in allowing Dr. LeVaughn to testify about blood spatter.

¶51. Morrison argues forensic pathologist Dr. LeVaughn should not have been allowed to give opinion testimony that was "outside of his areas of expertise." Specifically, Morrison takes issue with Dr. LeVaughn's testimony regarding blood spatter.

¶52. "[O]ur supreme court has indicated that forensic pathologists are qualified to give opinions regarding blood spatter." *Flaggs v. State*, 999 So. 2d 393, 403 (¶29) (Miss. Ct. App. 2008) (citing *Whittington v. State*, 523 So. 2d 966, 976 (Miss. 1988)). Under this precedent, we have allowed a forensic pathologist to testify about blood spatter. *Id.* (holding that "while there was no mention of blood spatter analysis during [the pathologist's] expert qualification, we cannot say under the circumstances of this case that the trial court erred in allowing [him] to testify regarding blood spatter").

¶53. To support his argument that Dr. LeVaughn should not have been allowed to testify about blood spatter, Morrison relies on a Supreme Court opinion about the admissibility of the testimony of a forensic pathologist. *Edmonds v. State*, 955 So. 2d 787 (Miss. 2007).

---

the majority of Morrison's protests over the graphic nature of the photograph would have been cured.

16

Specifically, he argues that even once a forensic pathologist is allowed to testify, "a court should not give such an expert carte blanche to proffer any opinion he chooses." *Id.* at 792 (¶8). In *Edmonds*, the Court found it was error to allow the pathologist to testify that he could tell from a bullet wound that two people were involved in discharging a rifle. *Id.* at (¶7).

¶54. The case at hand is far different. First, the expert in this case did not impermissibly speculate about the blood spatter found in Morrison's bedroom. When presented with photos of the crime scene, Dr. LeVaughn answered questions based on what he observed:

> Q. Dr. LeVaughn, this photo here . . . . Do you see blood spatter on the wall up here?
>
> A. I do.
>
> Q. To the naked eye of this photo, and I will hand you the photo, there is no blood spatter on that wall, is there?
>
> A. I do not see any in the photograph, no.
>
> Q. None equal to headboard or mattress or both; is that correct?
>
> A. In general that is correct.

In contrast to the expert in *Edmonds*, Dr. LeVaughn pointedly declined to speculate as to the position of the body at the time of the shooting:

> Q. And if that wall were in the vicinity of the exit wound of this shotgun shot would you expect to see blood spatter?
>
> A. Well, it depends on the direction of the exit wound. So I don't know the position she was shot in.

¶55. It was well within his expertise to generally opine that "blood spatter would be in the

17

area or opposite the area of the exit" and to review photographs made contemporaneously at the scene. *See* MRE 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed"). As a result, we find the expert here did not stray so far into the realm of speculation that it rendered his testimony inadmissible.

¶56. Furthermore, Morrison does not address or acknowledge the authority of *Whittington* and *Flaggs*, which have found that forensic pathologists may testify regarding blood spatter. Instead, he relies on *Edmonds* essentially to caution that "juries usually place greater weight on the testimony of an expert witness than that of a lay witness." *Edmonds*, 955 So. 2d at 792 (¶9). While this is undoubtedly the case, all juries are charged with the "duty to determine the facts and to determine them from the evidence produced in open court," basing their "verdict . . . on the evidence and not upon speculation, guesswork or conjecture." Indeed, this was the very first jury instruction received by this panel of fact-finders. Ultimately, "judging the expert's testimony and weight to be accorded thereto is the province of the jury." *Fleming v. Floyd*, 969 So. 2d 868, 878 (¶25) (Miss. 2007) (internal quotation marks omitted).

¶57. Given the precedent from our Supreme Court, and that the expert did not impermissibly speculate beyond what he personally observed, we cannot say that admitting his testimony constituted an abuse of discretion.

### IV. The trial judge did not abuse its discretion in excluding Dr. O'Brien's testimony.

¶58. Morrison argues that in excluding expert testimony from forensic psychologist Dr.

18

Gerald O'Brien, the trial court prevented Morrison from developing his theory of defense regarding his mental state.

¶59. Our Supreme Court has long held that "diminished capacity . . . is not a defense to a criminal charge in this state." *Cannaday v. State*, 455 So. 2d 713, 720 (Miss. 1984). While diminished capacity is not a defense, Mississippi does allow the defense of insanity. *Parker v. State*, 273 So. 3d 695, 698 (¶11) (Miss. 2019). Courts also consider evidence of a defendant's competency. *Id*.

¶60. During trial, counsel for Morrison explicitly disclaimed that Dr. O'Brien would testify to the insanity defense or to Morrison's competency.[2] Indeed, after years of examinations and litigation, the trial court had ruled that Morrison was competent to stand trial. Rather, defense counsel stated the purpose of the testimony was to explain "Morrison's mental state and his intellectual functioning" so that the jury could "get a full picture of the circumstances surrounding [the] event." He offered Dr. O'Brien would testify that "Morrison is of below average intelligence and dealt with things in a way that a person with normal intelligence would not have dealt with them" and that he "suffered from psychosis . . . at the time [Dr. O'Brien] evaluated him."[3]

¶61. It is apparent this was an attempt to bring in a prohibited defense under the guise of explaining Morrison's post-crime actions, as Morrison was essentially asserting diminished

---

[2] At Morrison's request the trial court gave jury instructions on the defense of insanity; he does not raise any issue on appeal regarding that theory of defense.

[3] Proffered testimony from Dr. O'Brien revealed he initially evaluated Morrison in November 2018—more than five years after the crime.

19

capacity. A very similar scenario was presented in *Cannaday*. There, a defendant "sought to show [her] limited mental ability" through testimony from two psychiatric experts. *Cannaday*, 455 So. 2d at 720. The defense hoped to "counter the state's case of [the defendant's] knowing participation in this crime." *Id*. On appeal, the defendant challenged the exclusion of that expert testimony. *Id*. Noting that sanity "was not in issue in the case," the Supreme Court determined the defendant was instead "trying to assert a diminished capacity defense," which is prohibited. *Id*. Accordingly, the Court found "that no error was committed" in excluding the testimony. *Id*.

¶62. Given the conceded reality that Dr. O'Brien was not going to testify as to competence or insanity, we find that it was not an abuse of discretion to exclude the witness from testifying at trial. The substance of Dr. O'Brien's opinion was focused on an argument that Morrison had diminished capacity. As this defense is prohibited under our precedent, we will not find the trial court in error on this point.

## V. It was harmless error to admit hearsay testimony regarding the father of Octavia's unborn child.

¶63. Finally, Morrison argues that the trial court erred in admitting hearsay testimony from Catrina Love that Morrison was not the parent of Octavia's child.

¶64. "Hearsay is a statement that '(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.'" *Montson v. State*, 318 So. 3d 1133, 1142 (¶46) (Miss. Ct. App. 2020) (quoting MRE 801(c)(1)-(2)).

¶65. The State called Octavia's mother Catrina to testify and elicited from her that

Morrison was not the father of Octavia's child. When asked, "At any time did you inquire as to who the father of your grandbaby was?" Catrina responded, "[Octavia] just told me that her and Calvin was fixing to have a baby." The State then built upon this statement in its closing, bluntly telling the jury, "We're looking for a motive . . . . We're looking for some reason," next speculating that Octavia had told Morrison she was breaking up with him and that the baby was not his child. There was no objection to these claims, which were not founded on any testimony admitted during the trial.

¶66. On appeal, Morrison argues that this testimony "was of monumental importance to the State's case and theory," demonstrating how it was used to show the truth of the matter asserted. In response, the State argues Octavia's mother's statement was not hearsay since "Catrina's testimony was offered to prove motive, not to prove" the exact parentage of the child.

¶67. The jury ultimately found Morrison committed culpable-negligence manslaughter but did not act with deliberate design in the death of Octavia; the jury fully acquitted him on the death of the child. Therefore even if the statement elicited from Catrina at trial was hearsay, any error was harmless because it did not prejudice Morrison in the eyes of the jury. "For a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Jackson v. State*, 245 So. 3d 433, 439 (¶32) (Miss. 2018) (quoting *Pham v. State*, 716 So. 2d 1100, 1102 (¶12) (Miss. 1998)). Accordingly, we affirm.

**CONCLUSION**

21

¶68.    Following Octavia's death, Morrison gave several highly inconsistent statements explaining how she died.  For this reason, he was not entitled to a judgment of acquittal under the *Weathersby* rule.  We find the trial court did not abuse its discretion in admitting two graphic autopsy photographs.  Further, it was not an abuse of discretion to admit Dr. LeVaughn's opinion testimony regarding blood spatter or to exclude expert testimony about Morrison's mental state.  Finally, even if there were error in admitting Catrina Love's testimony about the father of Octavia's child, it did not prejudice Morrison.

¶69.    Because we find no reversible error, the Hinds County Circuit Court's judgment is **AFFIRMED**.

**CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.  BARNES, C.J., AND WILSON, P.J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

22